# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

**THE TACTICAL EDGE, LLC**

      Plaintiff,

v.

**MERRICK B. GARLAND, Attorney General of the United States;**
**UNITED STATES DEPARTMENT OF JUSTICE; and**
**THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES**

      Defendants.

Civil No:

## COMPLAINT

Plaintiff, The Tactical Edge, LLC, ("Tactical Edge") files this complaint against Defendants Merrick B. Garland, in his capacity as the Attorney General of the United States of America, the United States Department of Justice and the Bureau of Alcohol, Tobacco, Firearms and Explosives, (collectively "the ATF") for relief and damages. Tactical Edge seeks a *de novo* judicial review pursuant to 18 U.S.C. § 923(f)(3) of the ATF's revocation of Tactical Edge's federal firearms licenses. In addition, Tactical Edge also seeks declaratory relief concerning the application and constitutionally of 18 U.S.C. § 921, *et seq.,* and regulations promulgated pursuant thereto in light of the United States Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022).

## Jurisdiction

**1.** Tactical Edge brings this complaint pursuant to 18 U.S.C. § 923(f)(3) for *de novo* judicial

1

review of the ATF's final notice of revocation of its federal firearms licenses.

2.   This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the United States Constitution since this suit constitutes a civil action against an executive department of the United States. 28 U.S.C. § 1346(a)(2).

3.   This Court has the authority to grant declaratory relief under 28 U.S.C. § 2201 and preliminary and permanent injunctive relief under 28 U.S.C. § 2202.

4.   Venue is proper in this district pursuant to 18 U.S.C. § 923(f) since the Plaintiff's principal place of business is in this judicial district.

5.   To the extent declaratory relief is sought, venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions asserted by the Plaintiff arose within this judicial district.

## Parties

6.   Tactical Edge is a Tennessee limited liability company having one of its principal places of business located at 1925 Fort Campbell Boulevard, Unit C, Clarksville, Tennessee 37042.

7.   Defendants are Merrick B. Garland, in his capacity as the Attorney General of United States of America, the United States Department of Justice, and the Bureau of Alcohol, Tobacco, Firearms and Explosives.

## Factual Background

**Congress Enacted the Gun Control Act in 1968.**

8.   Congress enacted the Gun Control Act in 1968. 18 U.S.C. § 921 *et seq*. (hereinafter the

"GCA").

**9.** In the GCA, Congress established a comprehensive scheme for licensing federal firearms licensees ("FFL" or "FFLs") with the intent to license and otherwise regulate the activities of FFLs. Included within statutory provisions are express standards relative to inspecting FFLs and revoking a federal firearms license.

**10.** In the GCA, Congress expressly authorized the Attorney General with the statutory authority to revoke a FFL if certain conditions are met. 18 U.S.C. § 923(e) provides in relevant part:

> (e)The Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter or fails to have secure gun storage or safety devices available at any place in which firearms are sold under the license to persons who are not licensees ....

**11.** Congress did not define the term "willfully" as used in 18 U.S.C. § 923(e).

**12.** In the GCA, Congress imposed significant record keeping requirements on FFLs. See *Fairmont Cash Mgmt., LLC v. James*, 858 F.3d 356, 362 (5th Cir. 2017).

**13.** In the GCA, Congress imposed significant burdens on FFLs.

**14.** In the GCA, Congress requires FFLs to keep records of their sales through a federally promulgated firearms transaction record, which record is commonly referred to as an ATF Form 4473. 18 U.S.C. § 923(g); 27 C.F.R. § 478.124.

**15.** In the GCA, Congress requires FFLs to contact the national instant check system ("NICS"), or in a "point of contact state" such as Tennessee, the state's designated instant check entity which is the Tennessee Bureau of Investigation which operates a system known as the Tennessee Instant Check System ("TICS"). 18 U.S.C. § 922(t).

**ATF's Regulatory Activities.**

16.  ATF first published a Form 4473 in December 1968.  Exhibit 1.  That form required a FFL to collect or record approximately 24 pieces of information with respect to each such transferee/buyer.

17.  By the time it promulgated its May 2020 version of ATF Form 4473, the ATF had increased the number of pieces of information that a FFL was required to verify or complete on the Form 4473 to over 100 distinct fields of information.  Exhibit 2.

18.  Under current requirements of the GCA and the ATF's regulations, a FFL operating in Tennessee is required in most instances to perform a background check when a transfer of a firearm would be made to an unlicensed individual and to record certain information on the Form 4473 based on that background check.  In Tennessee, a FFL must contact the Tennessee Bureau of Investigation to perform a background check using TICS.  See 18 U.S.C. § 922(t), Tennessee Code Annotated § 39-17-1316.

19.  In the regulations adopted by the ATF, the ATF has imposed significant record keeping requirements on FFLs.

20.  In the regulations adopted by the ATF, the ATF has imposed significant burdens on FFLs.

21.  The ATF inspects FFLs for compliance with the GCA.

22.  The ATF inspects FFLs for compliance with the regulations that the ATF has adopted relative to the GCA.

23.  Generally, the ATF conducts compliance inspections less than once per year. See 18 U.S.C. § 923(g)(1)(B).

4

24. ATF publicly claimed that its enforcement policy, at least prior to President Biden's June 2021 "zero tolerance" policy, *infra,* was to assist FFLs with their business practices. Further, ATF publicly claimed that the ATF's FFL inspections were designed to improve compliance by FFL's and that the ATF worked to "guide" FFLs into correction of errors and "ensure future compliance." ATF described its license review policies by stating that "on rare occasions" it seeks revocations when FFLs "demonstrate[s] a lack of commitment to improving his or her business practices". In its published "Fact Sheet" dated May 2014[1], (the "May 2014 Fact Sheet") the ATF states as follows:

> ATF industry operations investigators (IOI) conduct inspections of FFLs **to ensure compliance with the law and regulations and to educate licensees on the specific requirements of those laws and regulations. IOIs assist with business practices designed to improve compliance with the GCA. If violations are discovered during the course of an FFL inspection, the tools that ATF has available to guide the FFL into correction of such violations and to ensure future compliance** include issuing a Report of Violations, sending a warning letter, and holding a warning conference with the industry member. Despite these actions, **on rare occasions ATF encounters a licensee who fails to comply with the laws and regulations and demonstrates a lack of commitment to improving his or her business practices. In such cases where willfulness is demonstrated,** ATF's obligation to protect public safety may require revocation of the FFL.

Exhibit 3 (emphasis added).

25. The ATF represents to FFLs and to the public that ATF's compliance inspections are intended to improve compliance, that the inspections are directed to aiding the FFL with record keeping and compliance, that it does not seek revocation for paperwork errors but that instead the ATF seeks to aid FFLs in correcting such errors.

26. By October 2017, ATF published policies and procedures establishing standards and procedures that ATF Industry Operations Inspectors ("IOIs" or individually an "IOI") were to use

---

[1] The 2014 fact sheet remains current on the ATF's public web site: https://www.atf.gov/file/11136/download (last visited May 24, 2023)

in performing compliance inspections of FFLs. ATF published those policies and procedures in its Industry Operations Manual dated October 2017. Exhibit 4.

27. ATF has published "orders" setting forth the ATF's standards and policies regarding when and why it takes adverse action, including license revocations, against FFLs whom the ATF has determined had one or more violations of the GCA or the ATF's regulations. Those policies and orders date back to as early as April 14, 1988. See, ATF B 5370.1 dated May 8, 2003. Exhibit 5.

28. For purposes of the facts involved in this proceeding, ATF had developed written policies and procedures regarding when it would take adverse action against a FFL as a result of a compliance inspection and what the appropriate range of adverse actions should be. These policies are set forth in a document titled "Federal Firearms Administrative Action Policy and Procedures" dated February 21, 2017, and identified by ATF Order ATF O 5370.1C (hereinafter after the "ATF's 2017 Adverse Action Policy"). Exhibit 6.

29. ATF did not release the 2017 Adverse Action Policy to the public or to FFLs during the time that it was in force. As a consequence of that concealment, the standards on which ATF evaluated FFL's during compliance inspections and how ATF determined what adverse action it would take against FFLs who had violations, including whether to revoke a FFL's license, were policies and standards that were concealed by ATF and which were not generally communicated by ATF to the public or to FFLs.

30. The policies and standards that ATF included in its ATF's 2017 Adverse Action Policy, particularly those which address when adverse action should be imposed against a FFL, including license revocation, were not imposed by Congress in any statutory enactment.

31. The stated purpose of the ATF's 2017 Adverse Action Policy is "[t]his order provides

fair and consistent guidelines for administrative remedies for violations disclosed relative to inspections of Federal firearm licensees(FFLs)."

32. The ATF's 2017 Adverse Action Policy states in Section 4.c. that its authority to revoke a FFL is based on 18 U.S.C. § 923(e). ATF's description of that authority as set forth in the 2017 Adverse Action Policy states:

> Pursuant to 18 U.S.C. 923(e), ATF may only revoke a Federal firearms license for willful violations of the GCA and its implementing regulations. The term willfulness means a purposeful disregard of, a plain indifference to, or reckless disregard of a known legal obligation. ATF may also revoke or suspend a license, or impose a civil fine for certain knowing violations of the Brady Handgun Violence Act and the Child Safety Lock Act of 2005. ATF may revoke for any willful violation of the GCA including all of the violations discussed in this order and any other violation of the GCA.

33. Thus, as of the ATF's 2017 Adverse Action Policy, ATF was instructing its IOIs and decision making officials that the term "willful" included a "purposeful" disregard of, a "plain indifference" to, or "reckless disregard" of a "known legal obligation."

34. ATF's definition of the term "willful" or "willfulness" as contained in its 2017 Adverse Action Policy was not enacted by and has not been adopted by Congress as a statutory definition for that term.

35. While any violation of the GCA might give rise to a notice of violation, or even an administrative warning, license revocations require a higher burden on the ATF to prove that the violation was "willful" because of the statutory limits on ATF's authority imposed by Congress in 18 U.S.C. § 923(e).

36. The ATF's 2017 Adverse Action Policy states that each circumstance is unique and mitigating factors may be considered. Section 6.a.3. of the policy states:

(3) Each inspection has unique and sometimes complex circumstances. Therefore,

7

even in cases where violations appear willful, the field should consider the following questions when recommending administrative action:

> (a) Is the FFL willing/able to achieve and maintain voluntary compliance?
> (b) Will the continued operation of the FFL pose a threat to public safety or contribute to violent crime and other criminal activities?
> (c) Is the FFL taking responsibility for violations and willing to work with ATF to correct them?
> (d) Does the FFL understand the importance of firearms traceability and GCA records in protecting the public and reducing violent crime?
> (e) Do violations have a nexus to persons prohibited from possessing firearms?

**37.**  As stated in the 2017 Adverse Action Policy, the ATF has established as part of its adverse action policies one or more subjective factors that it considers in evaluating willfulness.

**38.**  As stated in the 2017 Adverse Action Policy, the ATF has established as part of its adverse action policies one or more subjective factors to be considered in evaluating whether the ATF will pursue the revocation of a FFL.

**39.**  As stated in the 2017 Adverse Action Policy, ATF officials may consider when evaluating whether to issue a warning letter the nature and number of violations, improvements in business operations, improvements in record keeping, etc., since the last inspection. The policy also states that a warning letter does not require a finding of willfulness with respect to the cause of the violations. The policy states in Section 6.c.:

> c.  Warning Letter. The field may issue a Warning Letter when violations of 27 C.F.R., Part 478; require a formal documented action on the part of ATF beyond the Report of Violations. The area supervisor may decide that a warning letter is not necessary based on the nature and number of violations, improvement in business operations, record keeping, etc., since the previous inspection, FFL's compliance history, time elapsed since previous inspection and other relevant factors may be considered. Sending a Warning Letter to a FFL does not require a determination of willfulness. Violations that generally merit a Warning Letter as the minimum administrative action include—but are not limited to—the following:
> > * * *

8

**40.** The 2017 Adverse Action Policy with respect to the "minimum" numbers and types of violations that may warrant a warning letter makes clear that ATF considers certain categories of errors below certain threshold percentages or numbers of incidents to be violations that likely do not warrant even a warning letter. For example, the policy provides in Section 6.c. specific threshold percentages for the quantity of errors in acquisition records to be "5 percent or more of the licensees total acquisitions during inspection period." Similar thresholds that would likely not warrant imposition of adverse actions are stated for other categories of errors, such as:

> (1) Failure to timely and/or correctly maintain records of receipt, manufacture, importation or other acquisition on 5 percent or more of the licensee's total acquisitions during the inspection period, with a minimum of 10 instances.
> (2) Failure to timely and/or correctly maintain records of sales or other dispositions on 5 percent or more of the licensee's total dispositions during the inspection period, with a minimum of 10 instances.
> (3) Failure by the licensee to obtain complete and accurate information for any item(s) on Forms 4473, questions 11 and 12, or the buyer fails to sign and date the Form 4473 in Section A on 5 percent or more of the Forms 4473 examined except when any purchaser is prohibited - refer to subparagraph 6.e.(3).
> (4) Failure to record valid and complete transferee identification (ID) on 10 percent or more of the Forms 4473 examined.
> (5) Failure to record any transferee ID on 10 percent or more of the Forms 4473 examined.
> ***

**41.** Under the ATF's 2017 Adverse Action Policy, as indicated in Section 6.c., a significant number of errors or violations, e.g., less than 5 percent in certain areas, could exist in a FFL's records and yet no adverse action against the FFL by ATF would be required or appropriate.

**42.** Under the ATF's 2017 Adverse Action Policy, a determination of willfulness is not required as a condition precedent to ATF issuing a Report of Violations, a Warning Letter or requiring the FFL to attend a Warning Conference.

**43.** ATF updated its Industry Operations Manual in October 2019. Exhibit 7.

9

**44.** The October 2019 Industry Operations Manual remained the most current version of that document at least through March 29, 2023.

**45.** By October 2, 2019, ATF amended its written policies and procedures regarding when to take adverse action against a FFL as a result of a compliance inspection and what the appropriate range of adverse actions could be. These policies are set forth in a document titled "Federal Firearms Administrative Action Policy and Procedures" dated October 2, 2019, and identified by ATF Order ATF O 5370.1D (hereinafter the "2019 Adverse Action Policy"). Exhibit 8.

**46.** ATF did not generally release the 2019 Adverse Action Policy to the public or to FFLs during the time that it was in force. As a consequence the standards on which ATF evaluated FFL's during compliance inspections and how ATF determined when and what adverse action it would take against FFLs who had violations, including whether to revoke a FFL's license, were standards that were concealed by ATF and which were not communicated by ATF to the public or to FFLs.

**47.** The policies and standards that ATF included in its ATF's 2019 Adverse Action Policy, particularly those which address when adverse action should be directed against a FFL, including license revocation, were not imposed by Congress in any statutory enactment.

**48.** The stated purpose of the ATF's 2019 Adverse Action Policy is "[t]his order provides fair and consistent guidelines for administrative remedies for violations disclosed relative to inspections of Federal firearm licensees(FFLs)."

**49.** The ATF's 2019 Adverse Action Policy states in Section 5.c. that its authority to revoke a FFL is based on 18 U.S.C. § 923(e). ATF's description of that authority as set forth in the 2019 Adverse Action Policy states:

> Pursuant to 18 U.S.C. 923(e), ATF may only revoke a Federal firearms license for willful violations of the GCA and its implementing regulations. The term willfulness

10

means a purposeful disregard of, a plain indifference to or reckless disregard of a known legal obligation. ATF may also revoke or suspend a license or impose a civil fine for certain violations of the Brady Handgun Violence Act and the Child Safety Lock Act of 2005. ATF may revoke for any willful violation of the GCA including all of the violations discussed in this order and any other violation of the GCA.

50. Thus, as of the ATF's 2019 Adverse Action Policy, ATF was instructing its IOIs and decision making officials that the term "willful" required proof of a "purposeful" disregard of, a "plain indifference" to, or "reckless disregard" of a "known legal obligation." While any violation of the GCA might give rise to a notice of violation, or even a warning, revocations required a higher burden of proving that the violation was "willful" because of the statutory limit on its authority imposed by Congress in 18 U.S.C. § 923(e).

51. ATF's definition of the term "willful" or "willfulness" as contained in its 2019 Adverse Action Policy was not enacted by and has not been adopted by Congress as a statutory definition for that term.

52. While any violation of the GCA might give rise to a notice of violation, or even an administrative warning under the 2019 Adverse Action Policy, license revocations require a higher burden on the ATF to prove that the violation was "willful" because of the statutory limit on ATF's authority imposed by Congress in 18 U.S.C. § 923(e).

53. The ATF's 2019 Adverse Action Policy states that each circumstance is unique and mitigating factors may be considered. Section 6.a.3. of the policy states:

(3) Each inspection has unique and sometimes complex circumstances. Therefore, even in cases where violations appear willful, the field should consider the following questions when recommending administrative action:
(a) Is the FFL willing/able to achieve and maintain voluntary compliance?
(b) Will the continued operation of the FFL pose a threat to public safety or contribute to violent crime and other criminal activities?
(c) Is the FFL taking responsibility for violations and willing to work

11

with ATF to correct them?
(d) Does the FFL understand the importance of firearms traceability and GCA records in protecting the public and reducing violent crime?
(e) Do violations have a nexus to persons prohibited from possessing firearms?

**54.** As stated in the 2019 Adverse Action Policy, the ATF has established as part of its adverse action policies one or more subjective factors to be considered in evaluating willfulness.

**55.** As stated in the 2019 Adverse Action Policy, the ATF has established as part of its adverse action policies one or more subjective factors to be considered in evaluating whether the ATF will pursue a revocation of an FFL.

**56.** The 2019 Adverse Action Policy states that ATF officials may consider when considering whether to issue a warning letter the nature and number of violations, improvements in business operations, improvements in record keeping, etc., since the last inspection. The policy also states that a warning letter does not require a finding of willfulness with respect to the cause of the violations. The policy states in Section 6.c.:

> c. Warning Letter. The field may issue a Warning Letter when violations of 27 C.F.R., Part 478; require a formal documented action on the part of ATF beyond the Report of Violations. The area supervisor may decide that a warning letter is not necessary based on the nature and number of violations, improvement in business operations, record keeping, etc., since the previous inspection, FFL's compliance history, time elapsed since previous inspection and other relevant factors may be considered. Sending a Warning Letter to a FFL does not require a determination of willfulness. Violations that generally merit a Warning Letter as the minimum administrative action include—but are not limited to—the following:
>    * * *

**57.** The 2019 Adverse Action Policy with respect to the "minimum" numbers and types of violations that may warrant a warning letter makes clear that ATF considers certain categories of errors below certain threshold percentages to be violations that likely do not warrant even a warning letter. For example, the policy provides in Section 6.c. specific threshold percentages, which are

12

relevant to the 2020 inspection, for the quantity of errors in acquisition records to be "5 percent or more of the licensees total acquisitions during inspection period." Similar thresholds that would likely not warrant imposition of adverse actions also are stated for other categories of errors, such as:

> (1) Failure to timely and/or correctly maintain records of receipt, manufacture, importation or other acquisition on 5 percent or more of the licensee's total acquisitions during the inspection period, with a minimum of 10 instances.
> (2) Failure to timely and/or correctly maintain records of sales or other dispositions on 5 percent or more of the licensee's total dispositions during the inspection period, with a minimum of 10 instances.
> (3) Failure by the licensee to obtain complete and accurate information for any item(s) on Forms 4473, questions 11 and 12, or the buyer fails to sign and date the Form 4473 in Section A on 5 percent or more of the Forms 4473 examined except when any purchaser is prohibited - refer to subparagraph 6.e.(3).
> (4) Failure to record valid and complete transferee identification (ID) on 10 percent or more of the Forms 4473 examined.
> (5) Failure to record any transferee ID on 10 percent or more of the Forms 4473 examined.
> ***

**58.** Under the ATF's 2019 Adverse Action Policy, as indicated in Section 6.c., a significant number of errors or violations, e.g., less than 5 percent in certain areas, could exist in a FFL's records and yet no adverse action against the FFL by ATF would be required or appropriate.

**59.** Under the ATF's 2019 Adverse Action Policy, a determination of willfulness is not required as a condition precedent to ATF issuing a Report of Violations, a Warning Letter or requiring the FFL to attend a Warning Conference.

**60.** ATF statistics reflect the collaborative approach referenced in its May 2014 Fact Sheet as well as reflected in the policies contained in the Industry Operations Manuals and the ATF's Adverse Action Policies that they were issued up through 2019. In 2020, the latest year published on its website, ATF successfully sought revocation 40 times out of 5,823 inspections (.686%). ATF

also reported that 96 FFLs discontinued operations or surrendered their licenses. In 2020, only 56%

percent of the 5,823 inspections resulted in "no violation" reports. The rest (2,546) contained some

sort of violation. The far more common response to violations of the GCA were a "Report of

violations" (1,289 instances), a "Warning letter" (804), or a "Warning conference" (306). See,

https://www.atf.gov/firearms/firearms-compliance-inspection-results (last visited May 24, 2023)

**61.**  In 2021, the ATF sought revocation in only 27 out 6,639 inspections (.406%).   ATF

reported that 789 FFLs discontinued operations as a result of compliance inspections.  ATF also

reported that it issued 985 instances for "Report[s] of violations", 454 instances of "Warning

letter[s]", and 149 instances of "Warning conference[s]" as a result of compliance inspections. See

https://web.archive.org/web/20220822160407/https://www.atf.gov/resource-center/fact-sheet/fac

t-sheet-facts-and-figures-fiscal-year-2021  (last visited May 24, 2023)


**President Biden Announces "Zero Tolerance" Policy.**

**62.**  On June 23, 2021, President Biden's office announced a new "zero tolerance" policy that

he was instituting and through which he was directing ATF to increase the number of FFL

revocations nationally.  In relevant part, that announcement stated:

> **Establishing zero tolerance for rogue gun dealers that willfully violate the law**.
> Gun dealers across the country are regulated by federal law that is enforced by the
> Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). Dealers that fail to
> comply with their obligations under the law create risks for all of us. Today, the
> Justice Department is announcing a new policy to underscore zero tolerance for
> willful violations of the law by federally licensed firearms dealers that put public
> safety at risk. Absent extraordinary circumstances that would need to be justified to
> the Director, ATF will seek to revoke the licenses of dealers the first time that they
> violate federal law by willfully 1) transferring a firearm to a prohibited person, 2)
> failing to run a required background check, 3) falsifying records, such as a firearms
> transaction form, 4) failing to respond to an ATF tracing request, or 5) refusing to
> permit ATF to conduct an inspection in violation of the law.

14

https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/23/fact-sheet-biden-harris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crime-and-ensure-public-safety/ (emphasis in original) (last visited May 24, 2023)

63. The changes in enforcement policy announced by President Biden implemented a strict liability enforcement policy that presumptively required revocation based on the category of the violation rather than on whether the FFL intentionally or willfully the violated the FFL's lawful duties.

64. The changes announced by President Biden in June 2021 were not enacted by Congress nor have they been subsequently ratified by Congress.

65. On July 14, 2021, the ATF issued a memorandum announcing the "Implementation of the Administration's Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety." Exhibit 9.

66. In the July 14, 2021, ATF memorandum the ATF stated that certain FFL violations "[a]bsent extraordinary circumstances ... shall result in a revocation recommendation."

67. The ATF's July 14, 2021 memorandum evidenced an enhanced enforcement policy of presumptive revocation based on the category of the violation which would apply excepting only in "extraordinary circumstances."

68. The ATF's July 14, 2021 memorandum did not advise the public or FFLs what circumstances the ATF would consider under its new enhanced enforcement policy to constitute "extraordinary circumstances."

69. The announcement by ATF in the July 14, 2021, memorandum that certain violations shall result in revocations was not a change that was enacted by Congress nor was it a change that has been subsequently ratified by Congress.

15

**70.** In the July 14, 2021, ATF memorandum the ATF stated that it would be "amending ATF O 5370.1D, the Federal Firearms Administrative Action Policy and Procedures to incorporate these requirements."

**71.** ATF released an amendment to ATF O 5370.1D in a document titled" Federal Firearms Administrative Action Policy and Procedures" dated January 28, 2022, and identified by ATF Order ATF O 5370.1E (hereinafter the "2022 Adverse Action Policy"). Exhibit 10.[2]

**72.** The ATF's 2022 Adverse Action Policy, on information and belief, remains its most current Adverse Action Policy relative to FFLs.

**73.** ATF did not generally release the 2022 Adverse Action Policy to the public or to FFLs during the time that it was or during the time that it remains in force. As a consequence of the ATF's attempted concealment, the standards on which ATF evaluates FFL's during compliance inspections and how ATF determines what adverse action it would take against FFLs who had violations, including whether to revoke a FFL's license, are standards that are concealed by ATF and which are not communicated by ATF to the public or to FFLs.

**74.** To the extent that the ATF's 2022 Adverse Action Policy creates standards, policies or definitions that expand the basis for FFL adverse actions, including revocations, beyond what Congress provided for in 18 U.S.C. § 923, those changes have not been enacted or ratified by Congress.

**75.** To the extent that the ATF's 2022 Adverse Action Policy creates standards, policies or

---

[2] This ATF document can be obtained in the public record as part of a Fox News report on February 10, 2023, titled "Internal ATF docs show 'zero tolerance' guidelines for shutting down gun stores"

https://www.foxnews.com/politics/internal-atf-docs-show-zero-tolerance-guidelines-shutting-down-gun-stores (last visited May 24, 2023)

definitions that expand the basis for FFL adverse actions, including revocations, beyond what Congress provided for in 18 U.S.C. § 923, those changes are *ultra vires* and outside the scope of authority of an administrative agency.

**76.** The ATF's 2022 Adverse Action Policy was issued, at least in part, to implement President Biden's "zero tolerance" policy that his office announced in June 2021.

**77.** The ATF's 2022 Adverse Action Policy contained written policies and procedures regarding when to take adverse action against a FFL as a result of a compliance inspection and what the range of adverse actions could be.

**78.** The stated purpose of the ATF's 2022 Adverse Action Policy is "[t]his order provides fair and consistent guidelines for administrative remedies for violations disclosed relative to inspections of Federal firearm licensees(FFLs)."

**79.** The ATF's 2022 Adverse Action Policy states in Section 5.c. that its authority to revoke a FFL is based on 18 U.S.C. § 923(e). ATF's description of that authority as set forth in the 2022 Adverse Action Policy states:

> Pursuant to 18 U.S.C. 923(e), ATF may only revoke a Federal firearms license for willful violations of the GCA and its implementing regulations, including all of the violations discussed in this order and any other violations of the GCA. The term willful means a purposeful disregard of, a plain indifference to, or reckless disregard of a known legal obligation. ATF may also revoke or suspend a license or impose a civil fine for certain violations of the Brady Handgun Violence Act and the Child Safety Lock Act of 2005. See 18 U.S.C. §§ 922(t)(5) and 924(p).

**80.** The ATF's 2022 Adverse Action Policy states that each circumstance is unique and mitigating factors may be considered. Section 7.a.3. of the policy states:

> (3) Each inspection has unique and sometimes complex circumstances. Therefore, even in cases where violations appear willful, the field should consider the following questions when recommending administrative action:
>     (a) Is the FFL willing/able to achieve and maintain voluntary

17

compliance?
(b) Will the continued operation of the FFL pose a threat to public safety or contribute to violent crime and/or other criminal activities?
(c) Is the FFL taking responsibility for violations and willing to work with ATF to correct them?
(d) Is the FFL's failure to properly complete and maintain records directly impacting the traceability of firearms?
(e) Do the violations have a nexus to a person subject to the Federal firearms disabilities contained in either 18 U.S.C. §§ 922(g) or 922(n) (hereinafter "prohibited person")?

**81.** As stated in the 2022 Adverse Action Policy, the ATF has established as part of its adverse action policies one or more subjective factors to be considered in evaluating willfulness.

**82.** As stated in the 2022 Adverse Action Policy, the ATF has established as part of its adverse action policies one or more subjective factors to be considered in evaluating whether the ATF will pursue a revocation of an FFL.

**83.** The ATF's 2022 Adverse Action Policy states in Section 7.a.4. that it has a "zero tolerance policy for willful violations" that fall into certain specific categories. Under this policy, "revocation is the presumed action, unless extraordinary circumstances exist...."

**84.** The changes in enforcement policy announced by ATF in July 2021 and later detailed in the ATF's 2022 Adverse Action Policy implemented a strict liability enforcement policy that presumptively required revocation based on the category of the violation rather than on whether the FFL willfully committed the violation.

**85.** The changes in enforcement policy announced by ATF in July 2021 and later detailed in the ATF's 2022 Adverse Action Policy implemented a strict liability enforcement policy that was not enacted or adopted by Congress through the passage of legislation.

**86.** The ATF's 2022 Adverse Action Policy states in Section 7.a.4. several categories of violations that had in the past not been subject to any "zero tolerance" presumptive revocation or that

even called for revocation.

**87.** The ATF's 2022 Adverse Action Policy states that ATF officials may consider, when considering whether to issue a warning letter, the nature and number of violations, improvements in business operations, improvements in record keeping, etc., since the last inspection. The policy also states that a warning letter does not require a finding of willfulness with respect to the cause of the violations. The policy states in Section 7.c.:

> c. Warning Letter. The field may issue a Warning Letter (WL) when violations of 27 C.F.R. Part 478 merit documented action on the part of ATF beyond the Report of Violations. The AS may decide that a WL is not necessary based on the nature and number of violations, improvement in compliance with firearms laws and regulations, FFL's compliance history, time elapsed since the previous inspection, and other relevant factors may be considered. Sending a WL to a FFL does not require a determination of willfulness. Violations that generally merit a WL as the minimum administrative action include—but are not limited to—the following:
>           * * *

**88.** The ATF's 2022 Adverse Action Policy with respect to the "minimum" numbers and types of violations that may warrant a warning letter makes clear that ATF considers certain categories of errors below certain threshold percentages to be violations that likely do not warrant even a warning letter. For example, the policy provides in Section 7.c. specific threshold percentages for the quantity of errors in acquisition records to be "5 percent or more of the licensees total acquisitions during inspection period." Similar thresholds that would likely not warrant imposition of adverse actions also are stated for other categories of errors, such as:

> (1) Failure to timely and/or correctly maintain records of receipt, manufacture, importation or other acquisition on 5 percent or more of the FFL's total acquisitions during the inspection period, with a minimum of 10 instances.
> (2) Failure to timely and/or correctly maintain records of sales or other dispositions on 5 percent or more of the FFL's total dispositions during the inspection period, with a minimum of 10 instances.
> (3) Failure by the licensee to obtain complete and accurate information for any item(s) on Forms 4473, question 21, or failure to ensure the buyer signs and date the

Form 4473 (to include failing to have the buyer recertify their answer is the transfer takes place on a different date than the original signature) on 5 percent or more of the Forms 4473 examined except when any purchaser is prohibited.

(4) Failure to record valid and complete transferee identification on 10 percent or more of the Forms 4473 examined.

(5) Failure to record any transferee identification on 10 percent or more of the Forms 4473 examined.

***

89. Under the ATF's 2022 Adverse Action Policy, as indicated in Section 7.c., a significant number of errors or violations, e.g., less than 5 percent in certain areas, could exist in a FFL's records and yet no adverse action against the FFL by ATF would be required or appropriate.

90. The ATF's 2022 Adverse Action Policy states in Section 7.e.4. that there are a number of ways to "establish the knowledge element of willfulness" including many factors which are devoid of any violation at all. The examples listed by the ATF in the 2022 Adverse Action Policy include " (b) using inspection reports to establish willfulness <u>even if the inspection found no violations</u>..." (emphasis added), "(d) ... [showing] publications and information provided to the FFL which explain the FFL's legal responsibilities", "(e) demonstrat[ing] that the FFL has complied with the specific regulation on other occasions", and even "(f) demonstrat[ing] that the FFL has substantial experience as an FFL."

91. The ATF's 2022 Adverse Action Policy states in Section 7.e.6. that "revocation is an appropriate licensing action ... in response to the discovery" of certain listed violations. That section states that the "fact that there is only a single violation of subsections (a)-(e) below does not, in and of itself, constitute extraordinary circumstances and will not be an acceptable reason for an alternative recommendation."

92. The ATF's 2022 Adverse Action Policy states in Section 7.e.6. that "revocation is also an appropriate licensing action" upon a finding that "(m) the FFL has been the subject of a WC in

20

lieu of Revocation within the previous 5 years and the current inspection reveals repeated similar violation(s) *with no significant improvement*." (emphasis added)

93. Based on the ATF's own policy statements in its 2022 Adverse Action Policy, evidence of improvement even with respect to repeat violations should mitigate against a finding of willfulness.

94. In order to determine if a FFL has shown a "significant improvement" from one compliance inspection to another, it is relevant and necessary to consider the detailed records documented by the ATF in its files concerning a particular FFL including records relating to the current and prior inspections.

95. Generally, ATF maintains detailed records of information gathered during a compliance inspection which information is not reported back to the FFL nor is it contained on the ATF's "Report of Violations" to the FFL. The information is not typically detailed in any notice of revocation.

96. These detailed ATF records, including but not limited to compliance inspection records, over the prior approximate decade or more, have been obtained, compiled and maintained by the ATF manually in the past and, more recently, in computerized record keeping systems known as "N-Spect" and later an updated computerized system known as "Spartan" which are referenced and generally described in the 2019 Industry Operations Manual (see chapters B, C, G and H).

97. Relevant information to determine whether there have been repeat violations, the nature of any prior violations, prior relevant warnings and whether there have been any improvement in an FFL's compliance history or efforts is often found and is only available in the records maintained by ATF as part of its FFL and/or compliance inspection documentation. On information and belief,

21

these records would include information such as:

  **97.1.** Date range for records and inventories covered by a specific compliance inspection;

  **97.2.** Date range pertaining to the period of an onsite compliance inspection stating the start date of a compliance inspection, the number of days ATF officials were onsite at the FFL's place of business, the number of hours that the ATF officials spent performing the compliance inspection and the end date of a compliance inspection.

  **97.3.** Records detailing the inventory amounts for the dates covered by the compliance inspection.

  **97.4.** Records detailing the number of instances where the IOI found there were "open dispositions" in the inventory records, duplicate (or repeat) entries in the inventory records, and any noted errors attributable to the FFL's software based inventory system if used.

  **97.5.** Records detailing the number of firearms acquired by the FFL during the compliance inspection period.

  **97.6.** Records detailing the number of firearms sold or transferred by the FFL during the compliance inspection period.

  **97.7.** Records detailing the number of ATF Form 4473's for the compliance inspection period, the number of ATF Form 4473 that were individually reviewed by the IOI(s), and the specific errors/violations documented by the IOI(s) with respect to each such Form 4473.

  **97.8.** Records concerning any sales or transfers of firearms for which an ATF Form 4473 could not be located.

  **97.9.** Records concerning any "multiple sale reports" in the possession of the FFL,

the number of multiple sale reports alleged to be missing or erroneous, the multiple sale reports obtained by the IOI(s) from the ATF's tracing center, and reports identifying any discrepancies between the FFL's multiple sale report records and the ATF's own tracing center records.

**97.10.** Records concerning all TICS checks performed by the Tennessee Bureau of Investigation relevant to the FFL and the compliance inspection.

**97.11.** Records concerning any acts or omissions documented by the IOI or other ATF officials relative to or indicating FFL willfulness, knowledge, inadvertence or human errors.

**97.12.** Records concerning any communications by the IOI(s) or other ATF officials with the FFL, its responsible parties or employees concerning the FFL's license, the FFL's business operations, or the compliance inspection.

**97.13.** Records concerning any communications by the IOI(s) or other ATF officials with third parties (e.g., industry vendors, other FFLs, customers, etc.) concerning the FFL's license, the FFL's business operations, or the compliance inspection.

**97.14.** Records of any circumstances that might constitute mitigating or "extraordinary circumstances" as referenced in the ATF's Adverse Action Policies.

**98.** Records such as the examples listed in the immediately preceding paragraphs generally are not in the possession of a FFL and are not generally disclosed by the ATF to a FFL as part of or even following a compliance inspection.

**99.** Records such as the examples listed in the immediately preceding paragraphs generally are not in the possession of a FFL and are not generally disclosed by the ATF to a FFL as part of an agency warning letter, warning conference or hearing.

**100.** Generally, ATF's compliance inspection records do not reflect the number or quantity

of errors made by the ATF (e.g., ATF tracing center failures to enter into its database multiple sale reports for which the FFL has proof of transmission).

**101.** ATF acknowledges that the information entered into "Spartan" is subject to FOIA requests. See 2019 Industry Operation Manual, p. 42 ("All information entered into Spartan is retained in the history, even upon deletion. This information could be discoverable or released in a FOIA request.")

**102.** In order for a FFL who is subject to a revocation proceeding to be able to demonstrate relevant improvement in its compliance history and performance, the FFL would reasonably require access to the full and unredacted records maintained by the ATF concerning the FFL, its licensee status, and all of its prior application and compliance inspections.

**103.** Tactical Edge does not have copies of the records identified in the preceding paragraphs and subparts. Tactical Edge needs such records to present evidence in this federal review demonstrating that it has achieved material and relevant improvement in compliance since the 2020 inspection and that such improvement is compelling evidence that any errors in the 2022 inspection were not willful, as that term is used in 18 U.S.C. § 923(e), in part because of the material and substantial improvements in compliance that is evidenced by a review of the reduction in the categories and numbers of alleged violations identified by the ATF in the 2022 compliance inspection when compared with prior inspections. See, *Jim's Pawn Shop, Inc. v. Bowers*, 2008 WL 11380078, at *8 (E.D.N.C., 2008) ("Rather than willfulness to commit violations, the court finds that the evidence before the court shows, through a pattern of improvement during the years in which the inspections took place, a conscious effort to comply with the GCA. Not only did Jim's of Fayetteville and Jim's of Wilmington put guidelines and training in place, they also significantly reduced the

number of errors that were being made. This reduction in the number of errors, especially in light of the volume of firearm transactions, coupled with the testimony by the owners and employees of petitioners, as well as the testimony of some of the inspectors, of petitioners' desire to comply with the GCA, convinces this court that the violations which occurred were not willful as that term has been defined by the Fourth Circuit in *Prino* and *RSM*.").

**ATF's Enhanced Enforcement Scheme - Rather than Congressional Action - Has Led to an Increase in Agency Revocation Proceedings and Voluntary Discontinuance and Surrender of Licenses.**

**104.** Based on its self-reporting, ATF stated that in July-December 2021 that 34 of the FFLs inspected had "qualifying violations", of which it revoked 5, ATF did not revoke 1 following a hearing, that 24 FFLs "voluntarily ceased operations". ATF decided not to revoke 4 due to "extraordinary circumstances." Exhibit 11. As used in that report, a "qualifying violation" included one or more of the following:

- Refusal to allow an IOI to conduct an inspection
- Transferring a firearm to a prohibited person
- Failing to conduct a required background check
- Falsifying records
- Failing to respond to a trace request

**105.** Based on its self-reporting, ATF stated that in 2022 that 252 of the FFLs that it inspected had "qualifying violations", of which ATF revoked 88. ATF did not revoke 83 following a hearing. Sixty-nine (69) FFLs "voluntarily ceased operations." ATF decided not to revoke 12 due to "extraordinary circumstances." Exhibit 11.

**106.** ATF data of all compliance inspections in 2022, including those with "qualifying violations", shows that it inspected 6,979 FFLs, that it found no violations in 3,806 instances

25

Case 3:23-cv-00544    Document 1    Filed 05/26/23    Page 25 of 58 PageID #: 25

(54.53%). ATF issued a report of violation in 1,247 instances (17.86%). There were 1,037 instances where the licensee "discontinued" its business (14.858%). ATF it issued warning letters in 606 instances (8.68%), it conducted warning conferences in 131 instances (1.87%), that it issued revocations in 90 instances (1.289%) and that 62 instances had "other disposition." Exhibit 12.

107. Following the adoption in 2021 of a "zero tolerance" policy, the volume of revocations approximately doubled from 2020[3] to 2022.

108. The number of FFLs who discontinued business following a compliance inspection went from 96 in 2020, to 789 in 2021 (the year of the adoption of the zero tolerance policy) to 1,037 in 2022 which represents an increase by a factor of 10.8.

109. ATF's Enhanced Enforcement Policy is not warranted under the statutory language as intended by Congress and has resulted in demands by numerous ranking Congressional officials for ATF to abide by Congressional intent regarding its enforcement powers and to explain reports that there is a 500% increase in the ATF's revocation efforts in the first year of ATF's implementation of that enhanced policy. Exhibit 13.[4]

110. Similarly, Congressman Mark Green from Tennessee has also made demands on the ATF regarding its Enhanced Enforcement Policy in a letter dated October 5, 2022. Exhibit 14. In

---

[3] For 2020 statistics, see https://www.atf.gov/firearms/firearms-compliance-inspection-results (last visited May 24, 2023)

[4] Congressman Biggs writes in this letter (footnotes omitted):

"The DOJ's efforts to force its administration's agenda onto ATF are particularly disturbing. Local ATF field agents have shared they feel pressured to take actions against individual businesses that they do not feel are appropriate or in the interest of public safety. Some have even reported that ATF field divisions are being pitted against each other and being forced to compete on the number of licenses revoked. ATF Directors of Industry Operations, who oversee revocation proceedings, are being told to press forward with this escalating quota system or face professional repercussions. This commandeering of agency discretion to support the administration's agenda undermines ATF's ability to function as a specialized agency...."

that letter, Congressman Green states:

> In essence, it now appears that the Congressional requirement of a "willful violation" has been twisted into "negligence" or even mere human errors – a major distinction that ignores the plain language and intent of the law that Congress has enacted and that the ATF is bound to follow. Congress had no intent to authorize the ATF to strangle the chain of distribution through which citizens are generally expected to purchase firearms.
>
> * * *
>
> 18 U.S.C. 923(e) provides that the Attorney General may revoke a license if the license holder has willfully violated any provision of Chapter 44. Revocations may be granted only for willful violations, not unintentional errors or technical mistakes....
>
> * * *
>
> In light of the clear purpose and meaning of the law, the ATF must respect the limitations that Congress has imposed on this process. The ATF needs to work with licensees to improve compliance practices instead of weaponizing the revocation authority. The laws are intended to ensure that the government can prosecute unscrupulous gun dealers who intentionally and willfully sell firearms to those who are not allowed to have them and refuse to cooperate with investigations of crimes, while protecting those FFLs who may inadvertently make minor paperwork errors but are fairly seeking to comply with federal firearm laws as enacted by Congress. It is not a matter left to the discretion of administrators or even the President – it is the clear statutory prescription of Congress.

**111.**  Although Congressman Green requested a reply from the ATF to the issues raised in his letter, the ATF has ignored that request.

**ATF Issued a Federal Firearms License to Tactical Edge.**

**112.**  ATF has issued two separate federal firearms licenses to Tactical Edge.

**113.**  As of 2022, Tactical Edge had a license, 1-62-125-07-4B-08127 (hereinafter "License 1-62-08127"), which was issued for the business location at 1925 Fort Campbell Boulevard, Unit C, Clarksville, Tennessee 37042.  This licensed location was for the "retail" business activities.

**114.**  ATF performed an application inspection prior to the issuance of the initial FFL to Tactical Edge under License 1-62-08127.

27

**115.** As part of the application inspection in 2015, one or more ATF IOIs met with and interviewed Tactical Edge. That meeting was relatively brief. It did include some general instruction on the operation of a FFL but it not cover in detail all of the obligations of an FFL nor the categories of acts or omissions that might result in the ATF taking adverse action against a FFL such as warning letters, warning conferences, fines, suspensions or license revocations.

**116.** ATF performed compliance inspections on Tactical Edge for License 1-62-08127 in 2018, 2020 and 2022.

**ATF's 2018 Compliance Inspection for License 1-62-08127.**

**117.** The ATF's compliance inspection in 2018 on License 1-62-08127 involved one or more IOIs and involved ATF officials being onsite at the Tactical Edge premise for the period of June 25, 2018 to July 26, 2018.

**118.** During calendar year 2018, Tactical Edge's records indicate it acquired 1137 firearms and transferred 1098 firearms out of its inventory.

**119.** During 2018, Tactical Edge acquired 1137 firearms and its transferred 1098 firearms.

**120.** With respect to the 2018 compliance inspection, the ATF identified various instances which it asserted constituted record keeping errors by Tactical Edge on License 1-62-08127. These instances are documented by ATF in a "Report of Violations" dated August 23, 2018. Exhibit 15.

**121.** In the August 23, 2018, Report of Violations on License 1-62-08127 ATF identified the following instances of alleged violations:

    **121.1.** 20 instances where recorded acquisitions of firearms were not accurately entered in the FFL's acquisition records.

**121.2.** 4 instances where the ATF could not locate acquisition record entries for firearms that were in inventory.

**121.3.** 9 ATF Form 4473 "firearms transaction record" where ATF alleged that there was one or more errors or omissions with respect to questions "11a, 16, 29, and/or 33".

**121.4.** 27 ATF Form 4473 "firearms transaction record" where ATF alleged that there was one or more errors or omissions with respect to questions "1, 2, 7, 12a, 12b, 12c, 12d.1, and/or 15".

**121.5.** 4 ATF Form 4473 "firearms transaction record" where ATF alleged that the address of the transferee/purchaser that was on the form did not match the address on the transferee's driver's license.

**121.6.** 9 ATF Form 4473 "firearms transaction record" where ATF alleged that there were errors or omissions with respect to recording the background check ("TICS") information on the form.

**121.7.** 3 ATF Form 4473 "firearms transaction record" where ATF alleged that the information identifying the firearm(s) being transferred had inaccurate manufacturer information because someone wrote "Tactical Edge Arms" rather than "The Tactical Edge LLC"

**121.8.** 1 ATF Form 4473 "firearms transaction record" where ATF alleged that the serial number entered of ACKR116 should have been entered as ACKR115.

**121.9.** 6 ATF Form 4473 "firearms transaction record" where ATF alleged that the FFL made errors in either signing question 35 (the transferor FFL's signature) or in entering the correct date of the transfer in question 37.

**121.10.** 2 ATF Form 4473 "firearms transaction record" where ATF alleged it could

29

not locate in the FFL's records the Form 4473.

       **121.11.**  1 instance where ATF claimed that on June 26, 2018, the FFL transferred a "Glock frame" without having completing a Form 4473.

       **121.12.**  1 instance, being the same as referenced in the preceding paragraph, where ATF claimed that on June 26, 2018, the FFL transferred a "Glock frame" without performing a TICS background check.

       **121.13.**  3 instances where the FFL sold a AR15 lower receiver to an individual under the age of 21.

    **122.**  As a result of the 2018 compliance inspection, ATF sent a letter to Tactical Edge in which it stated that "any future violations, either repeat or otherwise, could be viewed as willful and may result in revocation of [its] license." Exhibit 16. That statement is misleading because federal law in 18 U.S.C. § 923(e) limits the authority of the Attorney General/ATF to only instances where the ATF shows that there are willful violations by the FFL:

> Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section **if the holder of such license has willfully violated** any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter or fails to have secure gun storage or safety devices available at any place in which firearms are sold under the license to persons who are not licensees ....

(emphasis added)

    **123.**  As a result of the 2018 compliance inspection on License 1-62-08127, Tactical Edge corrected all alleged errors related to its records as requested by the ATF even if Tactical Edge disagreed with the ATF's factual allegations. Tactical Edge made changes and corrections in an effort to cooperate with ATF and to ensure, as much as possible, that it was maintaining complete and accurate records. Tactical Edge was also attempting to fully cooperate with the instructions

being provided by ATF.

124. In an effort to achieve compliance and to address the alleged errors identified in the 2018 compliance inspection, Tactical Edge

124.1. terminated its manager at the retail store and terminated several employees;

124.2. it hired a new manager and implemented new training and retraining for all employees;

124.3. it restructured its entire records filing systems per the suggestions of the ATF's IOI; and

124.4. it attended several ATF compliance seminars.

125. The changes in Tactical Edge's policies and procedures following the ATF's first compliance inspection in 2018 resulted in reduced errors as the new hires, revised record keeping systems and new policies were being implemented.


**ATF's 2020 Compliance Inspection on License 1-62-08127.**

126. The ATF performed its second compliance inspection on Tactical Edge regarding License 1-62-08127 in 2020.

127. The ATF's compliance inspection in 2020 involved one or more IOIs and involved ATF officials being onsite for the period of January 28, 2020 to February 26, 2020.

128. During calendar year 2020, Tactical Edge's records indicate it acquired 1903 firearms and transferred 1860 firearms out of its inventory. These volumes were substantial increases over the volumes existing in 2018.

129. As of the date of the 2020 inspection Tactical Edge was still implementing new

training, procedures and processes.

    **130.**  With respect to the 2020 compliance inspection, the ATF identified various instances which it asserted constituted record keeping errors by Tactical Edge.  These included:

    **130.1.**  1 ATF Form 4473 "firearms transaction record" where ATF alleged that the FFL had failed to properly store the record in alphabetical, numerical or chronological order.

    **130.2.**  1 ATF Form 4473 "firearms transaction record" where ATF alleged that the FFL had failed to properly store the record because the retained record was a photocopy that did not include ATF's several pages of printed instructions which pages contained no data fields that were unique to the transfer.

    **130.3.**  1 instance where ATF alleged that the FFL had improperly sold and delivered a handgun to an out of state resident.

    **130.4.**  2 ATF Form 4473 "firearms transaction record" where ATF alleged that the FFL had failed to retain copies of the form.

    **130.5.**  3 ATF Form 4473 "firearms transaction record" where ATF alleged that the FFL had failed to complete a required TICS background check.

    **130.6.**  7 ATF Form 4473 "firearms transaction record" where ATF alleged that the FFL had failed to report the multiple sales of a handgun by the close of the business day.

    **130.7.**  17 instances where ATF alleged that the FFL's disposition records were not timely or accurately recorded all of which errors were corrected during the course of the inspection.

    **130.8.**  5 instances where ATF alleged there were errors in the acquisition or disposition records, two of which errors were alleged duplicate entries.

    **130.9.**  1 instance where ATF alleged a disposition was not entered into the

disposition records timely or correctly.

       **130.10.** 24 ATF Form 4473 "firearms transaction record" where ATF alleged that a) the transferee/buyer did not fully complete Section A of the form, or b) that the transferee/buyer did not resign and/or redate the form in instances where the transfer took place a different day than when the form was initially signed and date and/or  c) that the FFL had failed to retain complete copies of the Form.

       **130.11.** 19 ATF Form 4473 "firearms transaction record" where ATF alleged that there were either errors or omissions in boxes 16, 29, or 33 of the form.

       **130.12.** 9 ATF Form 4473 "firearms transaction record" where ATF alleged that box 18a of the form was either blank or incomplete.

       **130.13.** 15 ATF Form 4473 "firearms transaction record" where ATF alleged that boxes 19a, 19b or 19c of the form were either blank or incorrect.

       **130.14.** 1 ATF Form 4473 "firearms transaction record" where ATF alleged that box 27 was incorrect.

       **130.15.** 4 ATF Form 4473 "firearms transaction record" where ATF alleged that box 37 was blank.

       **131.** As a result of the 2020 compliance inspection on License 1-62-08127, ATF sent a letter to Tactical Edge in which it stated that "any future violations, either repeat or otherwise, could be viewed as willful and may result in revocation of [its] license."  Exhibit 17.  That statement is misleading because federal law in 18 U.S.C. § 923(e) limits the authority of the Attorney General/ATF to only instances where the ATF shows that there are willful violations by the FFL:

       Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section **if the holder of such license has willfully violated any**

33

**provision of this chapter or any rule or regulation** prescribed by the Attorney General under this chapter or fails to have secure gun storage or safety devices available at any place in which firearms are sold under the license to persons who are not licensees ....

(emphasis added)

**132.** As a result of the 2020 compliance inspection, Tactical Edge corrected all alleged errors to its records as requested by the ATF even if Tactical Edge disagreed with the ATF's factual allegations. Tactical Edge made the changes and corrections in an effort to cooperate with ATF and to ensure, as much as possible, that it was maintaining complete and accurate records.

**133.** As a result of the 2020 compliance inspection, Tactical Edge continued to implement and make changes in its policies, procedures and operations that were specifically intended to reduce and eliminate any errors in its operations.

**134.** As a result of the 2020 compliance inspection, Tactical Edge made additional significant changes to its managers, staff, policies and procedures. These included:

**134.1.** Firing all employees related to the 2020 compliance inspection including the general manager. It undertook a complete rehiring and retraining for all employees.

**134.2.** It invested over twenty-five thousand dollars ($25,000.00) into an all-new electric point of sale system and an electronic acquisition and disposition ("A&D") record keeping system. This was a major investment of time and expense because it moved Tactical Edge from paper books and was intended to address and resolve all acquisition and disposition errors that were alleged as a result of the 2018 and 2020 compliance inspections.

**134.3.** It hired and incurred the expense to relocated Jordan Fisher, who was formerly an ATF IOI and who was working for Cabelas, a major national firearms retailer chain, in Colorado. It hired her to work in order to create new standard operating procedures and to train new hires in

34

Tactical Edges' record keeping and 4473 audit structure.

**135.** As a result of the 2020 compliance inspection, Tactical Edge advised the ATF at a post-inspection conference that it would implement additional corrective actions and it did so. Those corrective actions included "1) Implemented a different filing system - ensuring all ATF Forms 4473 are filed in chronological order by disposition instead of by book, page, line number (numerical order/chronological by acquisition date), 2) All Forms are reviewed by two (2) people before customer leaves the store with the firearm, 3) Daily closing procedures were implemented: with nightly gun count and secondary review of all ATF Form 4473's, entry of all acquisitions and dispositions within the A&D record, and the filing of records by a manager on duty. 4) Every Saturday all ATF Form 4473s are reviewed by a responsible person, [and] 5) A serial number count/verification is conducted every 30 days." See, Exhibit 17.

**136.** Several of the changes references in the foregoing paragraph are in excess of what a FFL is required to do under the GCA and the regulations.

**137.** Tactical Edge voluntarily proposed and implemented these policy and procedure changes, including those not required by the GCA or the ATF's regulations, in a continuing effort to achieve compliance with its legal duties and to attempt to catch and minimize or eliminate areas for human errors.

**ATF's 2022 Compliance Inspection on License 1-62-08127.**

**138.** ATF performed a third compliance inspection on Tactical Edge for License 1-62-08127 in 2022.

**139.** During calendar year 2022, Tactical Edge's records indicate it acquired 2214 firearms

and transferred 2170 firearms out of its inventory. These volumes were material increases over the volumes existing in 2018 and 2020.

140. With respect to the 2022 compliance inspection, the ATF identified various instances which it asserted constituted record keeping errors by Tactical Edge. These included:

140.1. 1 instance where ATF alleged that the FFL had conducted a TICS check, that 30 days had expired from the date of the check but that the FFL transferred the firearm to the individual after the 30 day period without performing a second TICS check.

140.2. 6 instances where ATF alleged that there were errors or omissions on an ATF Form 4473.

140.3. 2 instances where ATF alleged that the FFL failed to accurately record TICS information in Section B of the ATF Form 4473.

140.4. 1 instance where the ATF alleged that the transferee/buyer had failed to sign and date the ATF Form 4473.

141. The ATF's compliance inspection in 2022 demonstrated that Tactical Edge under License 1-62-08127 had achieved a substantial reduction in both the number and categories of alleged violations when compared to its prior compliance inspections.

142. The ATF's compliance inspection in 2022 demonstrated that Tactical Edge on License 1-62-08127 had a substantial improvement in its compliance with its obligations as a FFL.

143. The ATF's compliance inspection in 2022 on License 1-62-08127 did not demonstrate any alleged violation which ATF asserted was an intentional violation by Tactical Edge of its legal duties.

36

**ATF Issued a Second License to Tactical Edge at second location.**

144. Under ATF's regulations, each location where an entity conducts business requires a separate license to be issued.

145. ATF issued to Tactical Edge license number 1-62-125-07-3K-09828 (hereinafter "License 1-62-09828") for its manufacturing facility which is located at 219 Industrial Drive, Unit B, Clarksville, Tennessee 37040.

146. Under the GCA and ATF's regulations, the operations of License 1-62-09828 were required to be maintained under an entirely separate set of books, records and transaction histories.

147. In the agency hearing that is the subject of this civil action, ATF did not introduce any exhibit reflecting a "Notice of Hearing" for License 1-62-09828.

148. In the agency hearing, ATF did not introduce any exhibit reflecting a "Confirmation of Hearing" for License 1-62-09828.

149. In the agency hearing, the ATF did not introduce any exhibit reflecting a "Notice of Violation" pertaining to any compliance inspection for License 1-62-09828.

150. In the agency hearing, the ATF did not introduce any exhibit reflecting any violation alleged to have been committed with respect to License 1-62-09828.

151. In the agency hearing, the ATF did not introduce any testimony of any violations with respect to License 1-62-09828.

152. In the agency hearing, ATF did not produce any initial Notice of Revocation for License 1-62-09828.


**ATF's Revocation of Tactical Edge's License 1-62-08127.**

**153.** ATF issued a Notice of Revocation dated June 30, 2022, addressed to Tactical Edge in which ATF gave written notice that it intended to revoke Tactical Edge's FFL License 1-62-08127, the retail license. Exhibit 18.

**154.** The ATF official who issued the notice concerning License 1-62-08127 was Steven Kolb, in his capacity as the Director of Industry Operations.

**155.** In the Notice of Revocation, ATF relied on only 4 specific charges regarding License 1-62-08127. Those 4 charges were:

**155.1.** That on one (1) occasion the FFL transferred a firearm without first contacting NICS/TICS to perform a background check after the initial 30 day transfer period for a prior TICS check had expired.

**155.2.** That on two (2) occasions the FFL transferred a firearm without recording the date that the FFL contacted TICS, the response from TICS, and/or the TICS transaction number on the Form 4473, specifically that box 27c was blank on the form.

**155.3.** That on one (1) occasion the FFL failed to sign and/or date the Form 4473, specifically that box 36 on the form was blank.

**155.4.** That on six (6) occasions the FFL failed to "obtain/execute" Form 4473 as indicted in the form's instructions that 3 boxes (21a, 23, or 6) were incorrect, blank or that the FFL otherwise did not follow instructions on the form.

**156.** Tactical Edge timely requested a hearing pursuant to 18 U.S.C. § 923(f).

**157.** On January 24, 2023, the ATF conducted a hearing at which the ATF was represented by Division Counsel Jennifer Crim. ATF was also represented by Director of Industry Operations, Steven Kolb, in his capacity as the hearing officer. Tactical Edge was not represented by an attorney

but was only represented by three individuals who were involved in the operations of the FFL.

**158.** ATF called Grant Allen to testify for ATF at the hearing. No other ATF officials testified at the hearing.

**159.** The hearing started at 8:45 a.m and was concluded by 11:00 a.m.

**160.** Whenever questioned during the hearing by ATF counsel regarding the factual basis for willfulness with respect to any of the alleged violations, the only testimony that Grant Allen gave was that the violations on License 1-62-08127, the retail location, were "repeat violations".

**161.** There was no testimony in the hearing by Grant Allen or other witnesses to establish that there were any violations of any kind with respect to License 1-62-09828, the manufacturing location.

**162.** Whenever Grant Allen was questioned during the hearing by ATF counsel regarding the alleged violations he did not testify that Tactical Edge, under either license, had  a) knowingly violated the law, b) that it had intentionally violated the law, c) that the alleged violations were the result of a reckless disregard for the law, and/or d) that the alleged violations were the result of a plain indifference to the law.

**163.** Whenever questioned during the hearing by ATF counsel regarding the alleged violations, none of the witnesses for Tactical Edge testified that Tactical Edge had a) knowingly violated the law, b) that it had intentionally violated the law, c) that the alleged violations were the result of a reckless disregard for the law, and/or d) that the alleged violations were the result of a plain indifference to the law.

**164.** There was no testimony at the hearing by the ATF witness or otherwise regarding whether Tactical Edge was attempting to comply with its legal duties as an FFL other than the

39

assertions by Grant Allen that the alleged violations were repeat violations.

**165.** There was no testimony at the hearing by the ATF witness or otherwise regarding whether Tactical Edge's compliance efforts between its 2020 and 2022 compliance inspections showed any reduction in either the number or categories of violations.

**166.** There was no testimony at the hearing by the ATF witness or otherwise regarding whether Tactical Edge's compliance efforts between its 2020 and 2022 compliance inspections showed any increase in either the number or categories of violations.

**167.** There was no testimony at the hearing by the ATF witness or otherwise regarding whether Tactical Edge was "willing/able to achieve and maintain voluntary compliance." See 2022 Adverse Action Policy, Section 7.a.(3)(a).

**168.** There was no testimony at the hearing by the ATF witness or otherwise regarding whether "the continued operation of the FFL [would] pose a threat to public safety or contribute to violent crime and/or other criminal activities." See 2022 Adverse Action Policy, Section 7.a.(3)(b).

**169.** There was no testimony at the hearing by the ATF witness or otherwise regarding whether "the FFL [was] taking responsibility for violations and willing to work with ATF to correct them." See 2022 Adverse Action Policy, Section 7.a.(3)(c).

**170.** There was no testimony at the hearing by the ATF witness or otherwise regarding whether "the FFL's failure to properly complete and maintain records [was] directly impacting the traceability of firearms." See 2022 Adverse Action Policy, Section 7.a.(3)(d).

**171.** There was no testimony at the hearing by the ATF witness or otherwise regarding whether "the violations have a nexus to a person subject to the Federal firearms disabilities contained in either 18 U.S.C. §§ 922(g) or 922(n)." See 2022 Adverse Action Policy, Section 7.a.(3)(e).

**172.** There was no testimony at the hearing from any witness as to whether the alleged violations were willful.

**173.** There was no testimony at the hearing from any ATF witness who actually made the determination that any of the alleged violations were willful.

**174.** When asked in the hearing in a series of questions to testify on issues like intent or severity of errors, Grant Allen testified that it was not his job to determined why errors occurred or the importance of a violation. He testified "I just, basically how it works for me is I just show up with the evidence, what I found. And then kind of the people above me are the ones that –"

**175.** Consistent with Grant Allen's testimony, the determination of whether there should be a revocation is initially made by ATF's Spartan software system rather than by an individual according to the 2019 Industry Operations Manual. The 2019 Industry Operations Manual states on page 66:

> Final Recommendation
> > (1) Inspection Findings
> > > (a) The IOI should select all applicable inspection findings identified during the inspection.
> > > (b) Based on the selections made by the IOI, **Spartan will identify the appropriate recommendation based on the ATF O 5370.10, Federal Firearms Administrative Action Policy.** Accordingly, it is important the IOI accurately select the appropriate inspection findings.

(emphasis added)

**176.** At the conclusion of the hearing, the hearing officer, Steven Kolb, took the matter under advisement.

**177.** On March 29, 2023, the ATF, acting again through Steven Kolb as the Director of Industry Operations, issued a Final Notice of Revocation to Tactical Edge with respect to License

41

1-62-09828 (hereinafter "2023 Final Notice of Revocation") . Exhibit 19. The attachments to the Final Notice of Revocation identify both License 1-62-08127 and License 1-62-09828.

**178.** None of the findings of fact in the 2023 Final Notice of Revocation state any violation of any kind under License 1-62-09828.

**179.** The first alleged violation addressed in the 2023 Final Notice of Revocation is the same as Count 1 in the June 2022 Notice of Revocation. The charge is that on one (1) occasion the FFL transferred a firearm to an unlicensed person without contacting TICS/NICS to do a background check. However, the facts cited are that Tactical Edge did perform a background check that was ultimately approved by TICS but that Tactical Edge transferred the firearm 38 days after the date that the TICS check was originally initiated. ATF asserted that any transfer more than 30 days after the initial TICS check required a *second* TICS check.

**180.** In the 2023 Final Notice of Revocation, the ATF cites 27 C.F.R. § 478.102(c) as the applicable rule for the 30 day limit on transfers.

**181.** The statutory provisions of the GCA do not contain a 30 day limit on transfers following the date of the initial background check.

**182.** Neither the 2018 Report of Violations nor the 2020 Reports of Violations involved any prior violations of 27 C.F.R. § 478.102(c) or, specifically, the requirement that a licensee perform a second TICS check after the 30 day period.

**183.** None of the warning letters from ATF to Tactical Edge make reference to 27 C.F.R. § 478.102(c) or to any prior violations of that specific code section.

**184.** There was no testimony in the hearing that ATF had ever warned or even educated Tactical Edge specifically about the 30 day window that is contained in 27 C.F.R. § 478.102(c).

42

**185.** There was no testimony that Tactical Edge had ever violated 27 C.F.R. § 478.102(c) in the past.

**186.** There was no testimony that the alleged violation of 27 C.F.R. § 478.102(c) this was a repeat violation.

**187.** During the agency hearing, Grant Allen did testify that the transfer was made within 30 days of the date that TICS issued an approval of the transfer.

**188.** There was no testimony that the transfer was to a prohibited person or otherwise a violation of either the GCA or the ATF's regulations.

**189.** The second alleged violation in the 2023 Final Notice of Revocation states that on 2 occasions Tactical Edge failed to complete "Item 27c" on Form 4473 which is an alleged violation of 27 C.F.R. § 478.124(c)(3)(iv).

**190.** "Item 27c" on the May 2020 version of Form 4473 says "The response initially provided by NICS or the appropriate state agency was:" and then the Item has listed check boxes for "Proceed", "Delayed", "Denied", and "Cancelled". While ATF alleged that this item was not checked on 2 Form 4473s, that is a *de minimis* error since Tactical Edge processed more than a thousand Forms 4473 processed by Tactical Edge during the inspection period. , Tactical Edge had in fact stapled to each Form 4473 the printed response from TICS that showed that the response from TICS was approved. Further, each Form 4473 showed in Item 27a the date that the TICS check was performed and in Item 27b the "transaction number" provided by TICS. Exhibits 20 and 21.

**191.** There was no testimony that either of these two (2) transfers was to a prohibited person or otherwise a violation of either the GCA or the ATF's regulations.

**192.** The 2023 Final Notice of Revocation concluded that the violations referenced in the

43

second alleged violation, for failing to complete "Item 27c" on Form 4473 which is an alleged violation of 27 C.F.R. § 478.124(c)(3)(iv), was willful because it was a repeat violation.

**193.** The 2023 Final Notice of Revocation in addressing the second alleged violation for failing to complete "Item 27c" on Form 4473 contains no statement as to whether these 2 isolated violations reflected an improvement by Tactical Edge for compliance with respect to this issue.

**194.** The 2023 Final Notice of Revocation fails to address whether Tactical Edges' changes in policy, procedure, practices, new hires, new training, or new software since 2018 or 2020 indicate that Tactical Edge was making good faith efforts to improve its compliance. See *Jim's Pawn Shop, Inc. v. Bowers*, 2008 WL 11380078, at *8 (E.D.N.C., 2008).

**195.** The ATF's 2022 Adverse Action Policy states that each circumstance is unique and mitigating factors may be considered and that examples of mitigating factors are listed in Section 7.a.3.[5] However, there is no indication anywhere in the 2023 Final Notice of Revocation that the ATF considered any mitigating factors set forth in its adverse action policy with respect to the second alleged violation.

---

[5] The 2022 Adverse Action Policy identifies these examples:

(3) Each inspection has unique and sometimes complex circumstances. Therefore, even in cases where violations appear willful, the field should consider the following questions when recommending administrative action:
    (a) Is the FFL willing/able to achieve and maintain voluntary compliance?
    (b) Will the continued operation of the FFL pose a threat to public safety or contribute to violent crime and/or other criminal activities?
    (c) Is the FFL taking responsibility for violations and willing to work with ATF to correct them?
    (d) Is the FFL's failure to properly complete and maintain records directly impacting the traceability of firearms?
    (e) Do the violations have a nexus to a person subject to the Federal firearms disabilities contained in either 18 U.S.C. §§ 922(g) or 922(n) (hereinafter "prohibited person")?

44

**196.** The third alleged violation in the 2023 Final Notice of Revocation states that on 1 occasion Tactical Edge failed to complete "Item 36" on Form 4473 which is an alleged violation of 27 C.F.R. § 478.124(c)(5). Exhibit 22.

**197.** This alleged violation constituted one (1) error as to this Item 36 out of more than a thousand Form 4473s that were completed during the period that was being inspected.

**198.** "Item 36" on Form 4473 regarding this alleged violation is a box where the FFL is supposed to enter the date of the transfer. Related to this item, Item 34 is where the FFL prints the name of the individual who has handling the sale for the FFL and Item 35 is where that individual signs the form. Both of those items were completed accurately and ATF did not charge any violations on Items 34 or 35. *Id.*

**199.** Other than being an isolated violation out of more than a thousand Form 4473s that were completed during the inspection period, there is no evidence that this violation was anything other than a *de minimis* human error.

**200.** There was no testimony that this transaction was to a prohibited person or otherwise a violation of either the GCA or the ATF's regulations.

**201.** The 2023 Final Notice of Revocation concluded that the violation referenced in the third alleged violation, for failing to complete "Item 36" on Form 4473 was willful because it was a repeat violation.

**202.** The 2023 Final Notice of Revocation in addressing the third alleged violation for failing to complete "Item 36" on Form 4473 contains no statement as to whether this single violation reflected an improvement by Tactical Edge for compliance with respect to this issue.

**203.** The 2023 Final Notice of Revocation fails to address whether the changes Tactical

45

Edge's policy, procedure, practices, new hires, new training, or new software since 2018 or 2020 indicate that Tactical Edge was making good faith efforts to improve its compliance. See *Jim's Pawn Shop, Inc. v. Bowers*, 2008 WL 11380078, at *8 (E.D.N.C., 2008).

**204.** The ATF's 2022 Adverse Action Policy states that each circumstance is unique and mitigating factors may be considered and that examples of mitigating factors are listed in Section 7.a.3.[6]

**205.** There is no indication anywhere in the 2023 Final Notice of Revocation that the ATF considered any mitigating factors with respect to the third alleged violation.

**206.** Other than being an isolated violation out of more than a thousand Form 4473s that were completed during the inspection period, there is no evidence that this violation was anything other than a mere human error as the FFL's representative testified in the agency hearing.

**207.** The fourth alleged violation in the 2023 Final Notice of Revocation alleges 6 violations of which 5 occasions asserted that Tactical Edge failed to make sure that the *buyer* accurately completed the Form 4473 which is an alleged violation of 27 C.F.R. § 478.21(a).

**208.** On two of the instances relative to the alleged fourth violation, the alleged error pertains to Item 21a which asks whether the buyer is the "actual buyer" (which includes gifts). Exhibits 23 and 24. In each instance, the transferee/buyer appears to have marked the column for "no."

**209.** The instructions for Items 21a are confusing to many because on one part of the form it says that "you are not the actual buyer transferee/buyer if you are acquiring the firearm(s) for another person" but then several pages later in the instructions to the Form 4473 under the paragraph of instructions for Question 21a it says "A person is also the actual transferee/buyer if he/she is

_____

[6] *Id.*

legitimately purchasing the firearm as a bona fide gift for a third party."  See Exhibit 25.

210.  On three of the instances relative to the alleged fourth violation, the alleged error pertains to Item 23 which is where the transferee/buyer is supposed to write the date that he/she completed the Form 4473 initially.  Exhibits 26, 27 and 28.  In each instance, the transferee/buyer appears to have been confused because they completed Item 23 by writing in their date of birth (which also appears in Item 15) rather than the date that they completed the form.

211.  The final instance in the fourth alleged violation asserts that "Item 6" was blank.  On this version of Form 4473, Items 1-5 are where the FFL is supposed to list the manufacturer, model, serial number, type and caliber of each firearm being transferred.   Item 6 says "Total Number of Firearms to be Transferred  (Please spell total number, e.g., one, two, etc.  Do not use numerals.)" Exhibit 29.

212.  In this instance, the FFL completed the form in Items 1-5 to identify a single firearm. Although Item 6 is blank, the form is self-evident that only one firearm was being transferred.

213.  There was no testimony that these transactions was to a prohibited person or otherwise a violation of either the GCA or the ATF's regulations.

214.  The 2023 Final Notice of Revocation concluded that the violations referenced in the fourth alleged violation were willful because they were repeat violations.

215.  The 2023 Final Notice of Revocation in addressing the fourth alleged violation contains no statement as to whether these alleged violations reflected an improvement by Tactical Edge for compliance with respect to this issue. Nor do the ATF's findings address whether the changes in policy, procedure, practices, new hires, new training, or new software since 2018 or 2020 indicate that Tactical Edge was making good faith efforts to improve its compliance. See *Jim's Pawn Shop,*

47

*Inc. v. Bowers*, 2008 WL 11380078, at *8 (E.D.N.C., 2008).

**216.** The ATF's 2022 Adverse Action Policy states that each circumstance is unique and mitigating factors may be considered and that examples of mitigating factors are listed in Section 7.a.3.[7]

**217.** There is no indication anywhere in the 2023 Final Notice of Revocation that the ATF considered any mitigating factors with respect to the third alleged violation.

**218.** There was no evidence in the agency hearing that the alleged fourth category of violations were anything other than a mere human error.

**219.** Title 18, U.S.C. § 923(f)(3) provides that the Unites States District Court for the district of the principle place of business of the petitioner shall have jurisdiction to hear complaints for a *de novo* judicial review of the Attorney General's findings regarding the revocation of a firearms license.

**220.** This complaint is filed within sixty (60) days of the receipt by Tactical Edge of said Final Notice.  See, 18 U.S.C. § 923(f)(3).

**221.** The substantial improvements from 2018 to 2020 and particularly from 2020 to 2022 compliance inspections demonstrate that Tactical Edge had not in any respect engaged in any conduct that constituted a willful violation of the Gun Control Act or any lawfully adopted regulations by the ATF.  As such, the ATF was not authorized to revoke either or both of the licenses held by Tactical Edge.

**222.** The small number of alleged errors, none of which implicated transfers to prohibited persons, are evidence of nothing more than occasional and rare human errors and demonstrate that

---

[7] *Id.*

Tactical Edge had not in any respect engaged in any conduct that constituted a willful violation of the Gun Control Act or any lawfully adopted regulations by the ATF. As such, the ATF was not authorized to revoke either or both of the licenses held by Tactical Edge.

223. The small number of alleged errors, none of which demonstrated evidence of a knowing attempt by Tactical Edge to violate its legal duties, evidence nothing more than occasional and rare human errors and demonstrate that Tactical Edge had not in any respect engaged in any conduct that constituted a willful violation of the Gun Control Act or any lawfully adopted regulations by the ATF. As such, the ATF was not authorized to revoke either or both of the licenses held by Tactical Edge.

224. The findings and conclusions of the Attorney General with respect to Tactical Edge as set forth in the 2023 Final Notice of Revocation are erroneous and are not supported by the evidence.

225. The 2023 Final Notice of Revocation is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and/or unwarranted by the facts to the extent that the facts are subject to trial de novo by a reviewing court.

## COUNT 1
## ATF WAS NOT AUTHORIZED TO REVOKE THE LICENSES

226. Congress, through enactment of the Gun Control Act, authorized the ATF to revoke a federal firearms license only in situations where it is clear that the holder of the license "willfully violated" the Gun Control Act or any regulations adopted by the Attorney General "under this chapter." 18 U.S.C. § 923(e).

227. Congress has not by enactment of any provision or amendment under the Gun Control Act provided that human errors, inadvertent mistakes, oversights, or even repeat violations constitute

49

willfulness under the Gun Control Act.

**228.** ATF has not promulgated any rule or regulation "under" the Gun Control Act which expands or otherwise includes within the definition of "willfully violated", as that term was used by Congress in 18 U.S.C. § 923(e), human errors, inadvertent mistakes, oversights, or even repeat violations.

**229.** It was not the intent of Congress in adding in 1986 the requirement that the ATF prove that a licensee "willfully violated" its legal duties to include within the scope of that term instances where errors by licensees were the result of human errors, inadvertent mistakes, oversights, or even repeat violations.

**230.** The evidence presented in the agency hearing did not establish any intentional or willful violations of the GCA or the rules or regulations lawfully adopted thereunder.

**231.** The evidence presented in the agency hearing established that the licensee has made material, costly and significant improvements since the 2018 and 2020 compliance inspections with respect to its ability to achieve and maintain compliance with its legal obligations.

**232.** The evidence presented in the agency hearing lacked any evidence tending to show that Tactical Edge was either unwilling or unable to achieve and maintain voluntary compliance.

**233.** The evidence presented in the agency hearing lacked any evidence tending to show that the continued operation of Tactical Edge under either or both licenses would pose a threat to public safety or contribute to violent crime and/or other criminal activities.

**234.** The evidence presented in the agency hearing lacked any evidence tending to show that Tactical Edge was not willing to take responsibility for any violations, even *de minimis* human errors and mistake.

50

**235.** The evidence presented in the agency hearing lacked any evidence tending to show that Tactical Edge was not willing to work with ATF to correct any mistakes or to improve its policies, procedures or compliance efforts.

**236.** The evidence presented in the agency hearing lacked any evidence tending to show that Tactical Edge had not made material efforts to improve its policies, procedures and records in an effort to achieve as much compliance as possible.

**237.** The evidence presented in the agency hearing lacked any evidence tending to show that Tactical Edge's alleged failure to properly complete and maintain records as alleged in the 2023 Notice of Final Revocation had any direct impact on the traceability of firearms or that there had ever been any instance relative to the 2022 compliance inspection where ATF had submitted a trace request that Tactical Edge was unable to timely answer.

**238.** The evidence presented in the agency hearing lacked any evidence tending to show that the alleged violations by Tactical Edge with respect to the 2022 compliance inspection had any nexus to a person subject to federal firearms disabilities contained in either 18 U.S.C. §§ 922(g) or 922(n).

**239.** In the absence of clear and convincing evidence presented by the ATF that Tactical Edge had "willfully violated" the Gun Control Act with respect to any alleged violation related to the 2022 compliance inspection, ATF was not authorized to revoke either or both of its licenses.

## COUNT 2
## CONTRAVENTION OF ATF'S POLICIES AND PROCEDURES

**240.** ATF has announced and follows written policies that governs the inspection and circumstances warranting adverse action, specifically license revocation, of a FFL.

**241.** These policies are contained in the ATF's Industry Operations Manual of October 2019

51

(or any successor that was in effect at the time of the 2022 compliance inspection) and/or in the ATF's 2022 Adverse Action Policy (or any successor that was in effect at the time of the 2022 compliance inspection).

242. ATF departed from its policies and procedures in revoking any and all FFLs held by Tactical Edge.

243. ATF's departure of its policies and procedures with respect to compliance inspections and revocations is arbitrary and capricious with respect to those policies.

244. ATF's departure from its policies and procedures calls for the revocation to be overturned under *INS v. Yang*, 519 U.S. 26, 32 (1995).

245. ATF's policies and procedures, including but not limited to its Enhanced Enforcement Policy as announced in 2021, are inconsistent with the Gun Control Act and thus unconstitutional, to the extent that they seek to include human errors, paperwork errors, and other inadvertent violations as a basis for establishing a "willful violation".

**COUNT 3**
**THE SECOND AMENDMENT RESTRICTS ATF'S DISCRETION**
**AND INFORMS THE STANDARD OF JUDICIAL REVIEW**

246. Tactical Edge has a right to manufacture, buy and sell firearms. That right exists independent of and prior to the adoption of the United States Constitution. That right is both recognized and protected by the Second Amendment's "shall not be infringed" mandate.

247. The owners and responsible parties under the Tactical Edge license have a right to manufacture, buy and sell firearms. That right exists independent of and prior to the adoption of the United States Constitution. That right is both recognized and protected by the Second Amendment's

52

"shall not be infringed" mandate.

248. As a vendor, Tactical Edge, is able to bring claims on behalf of its customers. *Craig v. Boren*, 429 U.S. 190, 195 (1976).

249. If Tactical Edge's licenses, or either of them, are revoked under an unlawful enforcement policy that violates the United States Constitution, it will not only infringe on the rights of Tactical Edge, its owners and responsible parties but such will also burden the Second Amendment rights of its customers.

250. The Second Amendment to the United States Constitution was ratified in 1791.

251. The Second Amendment states "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

252. The plain text of the Second Amendment covers the manufacture, purchase and sale of firearms and ammunition.

253. The rights protected under the Second Amendment include the right to engage in the commerce and/or business of being a gun dealer, gun manufacturer and/or operating a gun range. See, e.g., *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011).

254. There is a hindrance to an individual gun owners' ability to protect their own interests because they rely on licensees, such as Tactical Edge, in order to purchase firearms.

255. Reducing the availability of lawful gun ownership burdens citizens' rights under the Second Amendment including the individual right of self-defense. See, *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111, 2133 (2022).

256. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not

53

simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." See, *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111, 2126 (2022).

257. Under *Bruen*, the question of what the Nation's historical tradition of firearms regulation included is generally limited to the historical precedent at the time of the Second Amendment's adoption. *Bruen,* 142 S.Ct. at 2136 (" "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.")

258. As of 1791, there was no national historical tradition of government regulation or even licensing of firearms manufacturers, wholesalers, or dealers.

259. As of 1791, there was no national historical tradition of government regulation of the commercial sales of firearms.

260. As of 1868,[8] there was no national historical tradition of government regulation or even licensing of firearms manufacturers, wholesalers, or dealers.

261. *Bruen* declared unconstitutional under the 2nd and 14th Amendments a New York State handgun permit licensing scheme which vested <u>subjective</u> authority in government officials to approve or deny an application for a handgun permit.

262. The *Bruen* holding, applied to the federal firearms licensing scheme in 18 U.S.C. § 923(e) and assuming arguendo that the GCA is constitutional post-*Bruen*, requires that the determination of whether a licensee has willfully violated the law to be objectively assessed based

_____

[8] Although *Bruen* references 1868, it does so only because it is the date of ratification of the 14th Amendment.

54

on the statutory criteria set forth in 18 U.S.C. § 923(e).

263. The *Bruen* holding, applied to the federal firearms licensing scheme in 18 U.S.C. § 923(e), prohibits the ATF from having any authority to revoke a licensee based on any <u>subjective</u> criteria or factors external to those enumerated in 18 U.S.C. § 923(e).

264. ATF's policies and its interpretation of the scope of the phrase "willfully violated" as contained in 18 U.S.C. § 923(e) makes it harder for citizens to obtain firearms, train with them, and maintain them for lawful purposes, including self-defense.

265. Such a burden is not justified by findings of occasional human errors, inadvertent mistakes, paperwork errors, or even a *de minimis* number of occasional repeat errors.

266. Such a burden is not consistent with the nation's historical tradition of firearm regulation as it existed as of 1791.

267. The *Bruen* holding, applied to the federal firearms licensing scheme in 18 U.S.C. § 923(f)(3), requires that a court, when conducting a *de novo* review of the ATF's revocation of a federal firearms license, independently and without deference to the ATF's findings determine the facts and the law and to determine whether the objective criteria in 18 U.S.C. § 923(e) have been met. If so, *Bruen*'s rejection of governmental subjective assessments in licensing under the Second Amendment would require a finding that the ATF was not "authorized" to revoke Tactical Edge's federal firearms licenses.

268. Based on the Supreme Court's holding in *Bruen*, the ATF is not authorized to revoke a federal firearms license under the policies and procedures set forth in its 2019 Industry Operations Manual, its 2022 Adverse Action Policy and/or for any errors that are mere human errors, *de minimis* paperwork errors, and/or other inadvertent violations of the GCA.

269. Based on the Supreme Court's holding in *Bruen*, which has established the requirement that the government prove that any government infringement, including but not limited to the revocation of a federal firearms license under circumstances such as are shown in this action, was part of the nation's historical tradition of firearms regulation as of 1791, the ATF is not authorized to revoke a federal firearms license.

270. Based on the Supreme Court's holding in *Bruen* which has established the requirement that the government prove that any government infringement, the burden is on the government to prove that firearms licensing schemes for manufacturers and dealers was part of the nation's historical tradition of firearms regulation as of 1791.

271. Absent clear and convincing evidence by the ATF that firearms licensing schemes for manufacturers and dealers was part of the nation's historical tradition of firearms regulation as of 1791, the ATF is not authorized to prohibit or deny anyone the right to engage in commerce, manufacturing, retail sales or other commercial activities that are or may be protected by the scope of the Second Amendment.

## COUNT 4
## CLAIM FOR STATUTORY ATTORNEY'S FEES

272. The Gun Control Act provides in 18 U.S.C. § 924(d)(2)(B) for payment of the prevailing party's attorney fees resulting from ATF's actions under the Gun Control Act when such actions are found to be without foundation.

273. The Equal Access to Justice Act was designed to remove financial obstacles and make access to justice available and affordable for those who have claims against the United States government. See, 28 U.S.C. 2412(d):

56

(d) (1) (A) Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

**274.** Tactical Edge is a "party" within the scope of 28 U.S.C. 2412.

<br>

## COUNT 5
## STAY OF ENFORCEMENT ACTION

**275.** The Gun Control Act provides in 18 U.S.C. § 923(f)(3) that a licensee who has received a notice of revocation and a final notice of revocation subsequent to an agency hearing, may file a complaint for *de novo* review with a federal court. Tactical Edge has filed a timely complaint with this Court.

**276.** Tactical Edge seeks a stay of enforcement action by the ATF so that it can continue operations under its licenses pending the final resolution of this complaint and any potential appearl thereof. See, 18 U.S.C. § 923(f)(2) and Exhibit 19.

<br>

Wherefore, Tactical Edge prays that this Court grant this complaint and enter an order:

**1.** Declaring that the Defendants were not authorized under any statute or law to revoke either or both of its federal firearms licenses.

**2.** Declaring that the Defendants have acted unconstitutionally, arbitrarily and capriciously in the establishment of and/or application of standards for revocation of either or both of its federal firearms licenses.

**3.** Declaring the proper application of the *Bruen* Court's standard of review to the

57

Defendants' actions with respect to the revocation of either or both of its licenses.

**4.** Declaring the proper application of the *Bruen* Court's standard of review to the Defendants' policies and procedures relative to firearms licensure by the Defendants to those seeking to engage in activities, including the manufacture and/or commercial sale of firearms.

**5.** Declaring the proper application of the *Bruen* Court's standard of review and the Second Amendment to enjoin any enforcement of the license revocation provisions of the Gun Control Act and/or any regulations constitutionally adopted by the ATF pursuant thereto absent a showing by the ATF that such licensing or revocation schemes were part of the national historical tradition as of 1791.

**6.** Granting a stay, if not otherwise issued by the Defendants, to enforcement of the proposed revocation of either or both of its licenses pending the final resolution of this action.

**7.** Awarding Tactical Edge its fees and expenses in these proceedings pursuant to applicable federal law; and

**8.** Awarding any additional or alternative relief, which this Court deems appropriate and just.

Respectfully submitted:

/s/ John I.  Harris III
John I. Harris, III, # 012099

Schulman, LeRoy & Bennett, P.C.
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244-6670
jharris@slblawfirm.com

58