IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| THE TACTICAL EDGE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:23-cv-00544 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| GARLAND, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff's motion for a preliminary injunction (Doc. No. 8, "Motion").[1] Plaintiff seeks a "preliminary injunction to prohibit [one of] the Defendants, specifically the Bureau of Alcohol, Tobacco, Firearms and Explosives [('ATF')], from treating the Plaintiff's federal firearms license as 'terminated' or 'revoked' during the pendency of this Court's review of whether the Defendants have lawfully revoked those licenses." (Doc. No. 9 at 1). A hearing regarding the Motion was held on August 3, 2023, after which the parties filed supplemental briefing. (Doc. Nos. 39, 40).

For the reasons stated herein, Plaintiff's Motion will be DENIED.

### BACKGROUND

Plaintiff, The Tactical Edge, LLC, is a federal firearms licensee (FFL) which operates a retail and a manufacturing location, each under its own license. Plaintiff became licensed in 2015 and

---

[1] The original motion was for a temporary restraining order and preliminary injunction. This Court denied the TRO but deferred ruling on the preliminary injunction until after a hearing and opportunity for supplemental briefing. (Doc. No. 13).

William Boswell, Robert Snyder, and Dalton Houston are listed as "responsible persons."[2] Boswell and Snyder are co-owners.

Plaintiff has a history of violating regulations promulgated under the Gun Control Act (GCA), having been cited during its 2018 and 2020 compliance inspections. After each of these inspections, Plaintiff's representatives met with an ATF officer for a warning meeting. ATF inspected Plaintiff's operations again on March 1, 2022. During that inspection, ATF Industry Operations Investigator Grant Allen identified ten violations. One was categorized as a "background check violation," and the other nine were divided among three different types of "ATF Form 4473 Violations." (Doc. 1-19 at 2-3).[3] All of these violations were repeat violations, i.e., violations of a type for which Plaintiff previously had been cited. Nevertheless, since the 2018 violations, Plaintiff has significantly improved its compliance record overall. The compliance inspections identified 134 violations across 11 different types of violations in 2018, 127 violations across 15 types in 2020, and 10 violations across 4 types in 2022.[4] (Doc. No. 40 at 6-7).

On June 30, 2022, ATF issued Plaintiff a notice that its licenses would be revoked. Plaintiff requested a hearing, which was held on January 24, 2023. Director of Industry Operations (DIO) Steven A. Kolb presided over the hearing and ultimately concluded that Plaintiff's two licenses

---

[2] "Responsible Person" means, "in the case of a Corporation, Partnership, or Association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of the Corporation, Partnership, or Association, insofar as they pertain to firearms." (Doc. No. 30-1 at 21:7-14; *see also* Doc. No. 19 at 1).

[3] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page ___ of ___") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document.

[4] Each of the compliance inspections involved an evaluation of forms from the year before. The violations identified in the 2022 inspection occurred in 2021. To reduce confusion, the Court will refer to the violations by the year of their identification during a compliance inspection, not their occurrence, unless stated otherwise (i.e., "2018 violations," "2020 violations," and "2022 violations").

should be revoked because Plaintiff, by and through its responsible persons, had willfully violated the Gun Control Act.

On March 31, 2023, Plaintiff received the Final Notice of Revocation and, in turn, requested a stay to continue operations because it planned to file a complaint for judicial review. ATF issued two stays, which together authorized Plaintiff to continue operations through the complaint filing deadline. (Doc. 26-3 ¶¶ 15-16). Plaintiff filed its complaint (Doc. No. 1), ATF gave notice that it would not continue to stay the revocation for a third time given that the Court now had jurisdiction over the matter (Doc. 11-5), and Plaintiff filed a motion in this Court seeking a temporary restraining order and preliminary injunction (Doc. No. 14). This Court found that ATF was under no legal obligation to stay the revocation, denied the TRO, and deferred ruling on the request for a preliminary injunction. (Doc. No. 13). ATF continued to extend the stay of revocation through August 10 in light of this Court's preliminary injunction hearing on August 3, but only for "dispositions" (meaning that Plaintiff remained licensed through August 10, but only for purposes of selling firearms already in its inventory). (Doc. No. 26-8).

## STANDARD

The GCA provides that ATF may "after notice and opportunity for hearing, revoke any [federal firearms license] if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter . . . ." 18 U.S.C. § 923(e). 18 U.S.C. § 923(f)(3) provides for de novo review, by a federal district court, of a revocation.[5]

---

[5] Defendants filed two motions in limine, each of which seeks to exclude information relating to a particular type of information concerning ATF's views regarding stays of revocation. One type is ATF's decisions regarding whether to grant a stay to other FFLs (Doc. 36) and the other type is ATF's internal guidance regarding stays (Doc. 37). It is first worth noting that in this Court's previous opinion denying a TRO, the Court found that ATF was not required to issue a stay pending this litigation. In any event, this Court's

Those seeking a preliminary injunction must meet four requirements. *Mathews v. Wedemeyer*, No. 3:23-CV-00644, 2023 WL 4280927, at *3 (M.D. Tenn. June 29, 2023).[6] They must show a likelihood of success on the merits, irreparable harm in the absence of the injunction, that the balance of equities favors them, and that public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022). A plaintiff seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than "scant evidence" to substantiate their allegations. *See, e.g., Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of Covid-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (upholding denial of preliminary injunction when plaintiff made only a "small showing" related to the merits); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, *1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No.

---

decisions in this case are made de novo, and they are decisions about the propriety of ATF's decision to revoke rather than the propriety of ATF's decision not to further stay the revocation; accordingly, the Court's decision herein is made irrespective of what ATF's has decided (in this or any other case) or considered with respect to staying a revocation. Accordingly, to the extent that those motions in limine were not resolved on record at the hearing, they are granted, and evidence and argument relating to ATF's decisions on stays have not been considered as part of this Court's determination of whether a preliminary injunction is appropriate.

[6] As noted previously by the undersigned, s*ee, e.g., Mathews*, 2023 WL 4280927, at *3 n.4, Sixth Circuit case law is inconsistent on whether these four items are factors or requirements. Because the more recent Sixth Circuit case law and Supreme Court case law describe them as requirements, the Court believes that it is constrained to do the same. *Id.*

1:06-CV-811, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice." (citations omitted)). In deciding a motion for preliminary injunction, a court may consider the entire record, including affidavits and other hearsay evidence. *Sterling v. Deutsche Bank Nat'l Tr. Co.*, 368 F. Supp. 3d 723, 725 (S.D.N.Y. 2019); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018). In conducting the preliminary injunction analysis, the Court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016) (explaining that district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted). *See also Ohio State Conf. of N.A.A.C.P. v. Husted*, 768 F.3d 524, 535 (6th Cir. 2014), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

Of the four requirements Plaintiff must satisfy to obtain a preliminary injunction, the Parties have stipulated to the existence of one of them, namely irreparable harm. (Doc. No. 35). Two of the remaining three requirements, namely balance of the equities and the public interest, merge together to form one requirement in situations where the defendant is a public agency, as is the case here. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020). Thus, Plaintiff must establish two requirements: (1) a likelihood of success on the merits and (2) that the balance of equities and public interest favor a preliminary injunction.

Because Plaintiff has failed to meet its burden on the first, the Court does not need to reach the second.

## DISCUSSION

The primary rule applicable here is one that is unforgiving to FFLs subjected to revocation. That crucial rule is that one willful violation is sufficient to revoke a license. *Armalite v. Lambert*, 544 F.3d 644, 647 (6th Cir. 2008). *See also Shaffer v. Holder*, No. 1:09-0030, 2010 WL 1408829 (M.D. Tenn. Mar. 30, 2010). There is no dispute that the ten violations identified during the 2022 inspection occurred. The issue is whether Plaintiff has shown that ATF is unlikely to establish even a single willful violation.

The Sixth Circuit has described a willful violation as occurring when, "with knowledge of what the law requires, [a dealer] intentionally or knowingly violates the GCA's requirements or acts with plain indifference to them (i.e. recklessly violates them)." *Armalite*, 544 F.3d at 647 (interpreting *Appalachian Res. Dev. Corp. v. McCabe*, 387 F.3d 461, 464 (6th Cir. 2004)). Defendants' theory is the latter—that Plaintiff acted with plain indifference or recklessly. (*See* Doc. 41 at 25:21-28:4 (Defendants agreeing that their theory of the case is not "knowing at the time" but "a pattern of plain indifference and recklessness"); *see also* Doc. No. 39 at 3-5.)

Plaintiff argues that all the violations were mere human errors that unfortunately slipped through the cracks given the number of documents it handles. (*See* Doc. No. 40 at 5-11). Plaintiff further suggests its significantly improved history of compliance demonstrates that it is not indifferent or reckless with compliance. (*See id.*). Defendants respond that the violations were repetitive of previous violations, indicating a pattern of behavior sufficient for willfulness. (*See, e.g.*, Doc No. 39 at 5).

It is hard to agree with Defendants that the repetitive nature of the violations alone is sufficient to show willfulness in this case. Violations—even repeat violations—*can* be the result of mere human error not reflective of plain indifference, and so it is unpersuasive to say that because there were repeat violations there was plain indifference. In Plaintiff's case, the marked improvements in Plaintiff's overall compliance since 2020 strongly suggest an absence of plain indifference to compliance *generally*. Nevertheless, the issue is whether Plaintiff was willful as to a *single* violation, and Plaintiff conceivably can be culpable of willfulness with respect to particular 2022 violations even though the fact that they are repetitive does not suggest by itself that any one of them (let alone all of them) are willful. And here, the manner in which Plaintiff responded (or did not respond) to its previous Form 4473 violations—as opposed to the mere fact that the violations were repeat violations—indicates willfulness as to those repeated violations in 2022.

By the time of the 2022 inspection, Plaintiff had already had two inspections resulting in warning conferences. After each conference, Plaintiff committed to improving its processes for completing the 4473 forms, including additional reviews before and after the customer left the store. Despite being told that a single additional willful violation could revoke its licenses, Plaintiff did not adequately implement its proposed actions.

In 2018, following the warning conference, ATF sent a letter that stated corrective action was discussed in the conference and that Plaintiff had responded with new steps being taken to ensure compliance. (Doc. No. 30-1 at 236-37). Plaintiff by that time had also received, and signed, a Report of Violations listing the violations and setting forth "corrective action" to be taken. (Doc. No. 30-1 at 228-235).[7] As reflected in the letter, Plaintiff's response included Plaintiff-proposed

---

[7] Herein, the Court uses the term "corrective action(s)" to refer specifically to the particular actions listed on a Report of Violation as such, and it uses the term "Plaintiff-proposed responsive action(s)" to refer to action(s) proposed by Plaintiff (even if they happen to mirror one or more corrective actions).

responsive actions to be taken in sequence at the time of a transaction at the store: first, having "the employee conducting the transaction review[] the form," "then [having] the store manager conduct[] a secondary review prior to transferring the firearm," then having "a third review []conducted at the end of the day while the firearms are being recorded out of the A&D record." (Doc. No. 30-1 at 236-37). In 2020, Plaintiff again received and signed a Report of Violations listing the violations and setting forth corrective actions. (Doc. No. 30-1 at 241-46). And, again, Plaintiff received a letter following the warning conference confirming that Plaintiff had discussed corrective actions with ATF and had proposed responsive actions to be taken. (Doc. 30-1 at 247). This time, the Plaintiff-proposed responsive actions included having "[a]ll Forms []reviewed by two (2) people before customer leaves the store with the firearm[,]" then having "[d]aily closing procedures . . . [with] secondary review of all ATF Form 4473's[,]" then having "[e]very Saturday all ATF Form 4473s []reviewed by a responsible person." (*Id.*). Thus, by 2020, the Plaintiff-proposed process involved the initial completion of the form,[8] a review by that employee of the form, and then three reviews while the customer was present (by someone else), at the end of the day, and at the end of the week.

Yet, in 2022, the recorded "Licensee Response" for two of the violations was "[w]e will be double checking the 4473 before the customer leaves." (Doc. 30-1 at 202). The simple fact that in 2022 at least part of Plaintiff's suggested fix is the same as what it previously offered suggests

---

[8] From the language, it is unclear whether this "review" is intended to be one-in-the-same as the completion of the form or whether, instead, the expectation is that the employee would go through the form and complete it and then he or she would go through it again and review it. The word "review" itself suggests the latter, as it suggests double-checking something already existing, rather than looking at something still under completion.

recklessness or plain indifference to coming into compliance on Plaintiff's Form 4473 violations.[9] Indeed, it is not evident that the 2018 and 2020 processes were ever successfully implemented as described; the testimony of Plaintiff's representatives, describing its processes, do not indicate commitment to its proposed solutions.

The testimony explaining the process in place at the time of the 2022 violations was a bit muddled, but it seems best understood through Boswell's explanation of Plaintiff's current (as of the time of his testimony at the preliminary-injunction hearing) process. At that hearing, Boswell described three stages of review: the first is the actual completion; the second is the same person that completed the form reviewing it again (the timing of which depends on "how busy the store was at the time," ranging from "after the sale" to putting them aside in a designated spot to review at the end of the day); and the third is, at the end of the week, a designated reviewer, Houston, reviewing all the forms. It is unclear when this current review process was instituted, but it seems to post-date the time of the violations.).[10]

Boswell testified at the ATF hearing that Houston conducted the final review of the forms in 2020 (Doc. No. 30-1 at 153:15-17). Boswell later testified in the (preliminary-injunction) hearing before this Court that Houston's review was "kind of biweekly, monthly[.]" (Doc. No. 41 at 57:5-7). The testimony was unclear as to whether anyone besides the original salesperson had

---

[9] Again, the Court stresses that what indicates plain indifference is not the mere fact that the 2022 violations were a repeat of the kind of violations that had occurred before, but rather the circumstances surrounding the 2022 violations.

[10] The Court concludes this for two reasons. First, when asked, "Do you have a process in place to have someone sort of follow behind you at some point or follow behind the initial salesperson to check the forms?" Boswell responded, "Yes, we do. So we do *now*. So all forms will have eyes on it three times before it gets filed away . . . ." (Doc. No. 41 at 54:12-18) (emphasis added) As this testimony was given in 2023 and was discussing the 2022 violations (which occurred in 2021), "now" indicates that he intended to distinguish his testimony from the point in time at issue in the hearing (i.e., the time of the violations). Further, the Court followed this testimony with a question. In asking that question, the Court distinguished this testimony of "what [Plaintiff] do[es] now" from "what [Plaintiff was] doing at the time." The witness did not correct or clarify his testimony. (Doc. No. 41 at 56:4-12).

looked at the form before it reached Houston's stage of review and, if not, whether each salesperson consistently conducted a second review himself or herself. Regardless, a biweekly or monthly review is not the daily or weekly routine suggested by Plaintiff in its proposed responsive actions after the 2018 and 2020 warning conferences.

Additionally, Boswell testified at the ATF hearing that since the 2020 inspection he is involved in filling out the 4473 forms and that he will "sometimes . . . double check [his] forms." (Doc. No. 30-1 at 153:12-15). At the preliminary-injunction hearing, this Court asked Boswell to clarify what he had meant by the term "sometimes" as used in that prior testimony, and Boswell said that he was referring to occasions when he checks either his own forms or to occasions when Houston would need extra assistance in doing his additional round of review. (Doc. No. 41 at 57:12-58:5). It is therefore again unclear whether the form was reviewed twice by the employee completing it, and there is no indication that a second person checked the forms as described in the process Plaintiffs proposed in 2020 (and arguably also by the requirement of a manager's review in the 2018 proposed process).[11]

Despite being a listed "responsible person," attending warning conferences (Doc. No. 1-20 at 4), and being part owner, Snyder was familiar only with the processes of the manufacturing location where he worked and was unable to speak to if or why any of these mistakes occurred at

---

[11] After the "2020 audit or 2021 audit, after that hearing," Plaintiff "had one owner in each location to help with the paperwork[.]" (Doc. No. 41 at 90:10-11). Plaintiff therefore recognized a need for greater oversight at the retail location in order to come into compliance, yet Boswell's testimony that he (the owner who works at that location) only "sometimes" checks forms suggests that the owner, nevertheless, is not playing a greater oversight role than any other employee. And, in fact, that role is smaller than Houston's, who is expected to review every form in addition to those he completes during transactions.
    Boswell's ambiguous reference to the "2020 audit or 2021 audit" is indicative of the overall lack of clarity as to what measures Plaintiff implemented when, and in response to what.

the retail location. (Doc. No. 30-1 at 148:3-151:5). He testified that he reviewed records only related to the manufacturing location. (*Id.* at 149:15-150:6).

Though not a paragon of clarity, the testimony as a whole suggests that during the period of the violations, at best, (i) the forms were completed, (ii) then the person completing the forms (whether Boswell or someone else) would check the form at some point, and (iii) then Houston (or on occasion Boswell) would, biweekly or monthly, review the forms again. While it is unclear when the second check occurred,[12] it apparently did not occur before the customer left the store, as Plaintiff-proposed responsive actions in 2022 again included checking the form before the customer left—the same solution that was offered as early as 2018. As mentioned above, that Plaintiff failed to implement the proposed solutions to Form 4473 violations not just once, but twice, indicates recklessness toward the compliant completion of the forms.

The lack of clarity itself suggests plain indifference. Plaintiffs was warned at least twice that willful violations could result in revocation of their licenses. (Doc. No. 30-1 at 238, 247). Under these circumstances, each of Plaintiff's principals (presumably wishing not to suffer revocation) should have known, and been able to recite with the greatest of ease and clarity, what exactly is done (and by whom, and when) to review the forms. The myriad uncertainties in the record reflect that no principal was able to do this with clarity; still less—and setting uncertainties aside—does the record reflect that all three were able to do this at all. And, for that matter, each should have been able to say how what was done was consistent both with the corrective actions

---

[12] The corrective action in 2018 and 2020 indicated that a second review should occur with the customer still present. That apparently does not always happen, as Boswell testified that there is a designated place where Plaintiff's principals (or perhaps employees) set aside any forms they purportedly are unable to review until later. (Doc. No. 41 at 55:6-13). It is unclear, though, what point in time this testimony referred to and whether it would be applicable to the time period in which the 2022 violations occurred.

and Plaintiff-proposed responsive actions; however, the testimony did not reflect in any way that any principal was in any position to do this.

Additional testimony bolsters the conclusion that Plaintiff was at least plainly indifferent to the Form 4473 violations. Boswell testified:

> I don't think I could have done anything more than what we were doing. I think we invested our time, our money, our manpower and everything that we had to make sure that [sic] are in compliance and doing everything properly and safely . . . we are going to try to do everything absolutely possible to stay within compliance and be safe.

(Doc. No. 30-1 at 156:10-20; *see id.* at 155:15-21 (Houston testifying that, given the volume, "to come back and only have 10 forms that were in violation of current law or current ruling, I would say that that would . . . give us pretty good numbers.") [13]). While the Court can be sympathetic to this position, particularly given the improvements made overall, the Court cannot agree that these are the best efforts possible and that Plaintiff did everything it could. In fact, it is apparent that Plaintiff did not do everything that it could, given that it did not implement (systematically or even at all) the proposed solution from 2018 and 2020. Plaintiff does not argue that any of the mistakes on the forms would have been difficult to catch, and indeed they were not; a review of each form containing a mistake reveals that the error was readily apparent, such that an adequate review

---

[13] Plaintiff's testimonial evidence, such as this testimony by Houston, emphasized Plaintiff's increased volume of business. To the extent that Plaintiff could not keep up with the paperwork because of the increased volume, Plaintiff's other testimonial evidence did them no favors. Other testimony suggested that when the store gets too busy, Plaintiff's employees do not adhere to their standard procedures for reviewing forms and have built-in procedural workarounds to review forms after the fact. (Doc. No. 41 at 55:6-13 (Boswell testifying that when the store was too busy for the person completing the form to review it, it was set aside to instead be reviewed at the end of the day)). Yet, when asked if having only two employees and one owner work at the retail location was sufficient to keep everything running smoothly, Boswell replied, "It's all about the level of competence in my employees, yeah." (Doc. 41. at 90:6-22). Plaintiff's reliance on its high volume (as a large denominator) in its error rate is therefore undermined by the facts that (a) Plaintiff cannot keep up with its review processes given that volume and (b) Plaintiff does not suggest that the volume outpaced Plaintiff's ability to hire new employees so as to maintain those processes. Put more simply, Plaintiff seems plainly indifferent to the fact that Plaintiff concededly lacks at times the capacity to process this volume of paperwork in a manner designed to reach compliance.

process likely would have caught every single one of them.[14] Plaintiff's additional argument that the missing information was contained in other documents and could be later corrected, *see* (Doc. No. 40 at 7), is not persuasive for the same reason. Although the mistakes *could* be discovered and corrected, Plaintiff did not discover and correct them. Indeed, the fact that they could be discovered undermines Plaintiff's position, because it suggests that their non-discovery is the result of plain indifference, i.e., not bothering to enact a proposed, straightforward system that would have discovered and corrected them. Had these violations occurred with an adequate review system in place, the Court could more easily characterize these as mere (non-reckless) "human errors" or "clerical errors" as Plaintiff suggests. But through plain indifference, there was not an adequate review system in place.[15]

Plaintiff's reliance on the low (and decreasing) error rate falls flat because under the law that the Court must follow (regardless of whether it is draconian), one willful error is enough for revocation. That is, plain indifference to a single error is sufficient for Plaintiff to lose its licenses.[16]

---

[14] The undersigned realizes that 100 percent perfection is a demanding standard, and the Court's point (either here or elsewhere) is not to *personally* demand it. Rather, his point here is that there is no reason why an adequate review process, consistent with what precisely Plaintiff committed to, objectively should not have resulted in a 100 percent perfection rate. Elsewhere herein, the Court's point is that under the law the Court is bound to follow, ATF is allowed to revoke for *anything less than 100 percent perfection*— provided only that the imperfections include at least one willful violation. It is not this Court's place to challenge the law or tell ATF how to exercise whatever discretion it has to revoke or not revoke in the event of at least one willful violation. Relatedly, it is not this Court's place to demand that ATF afford leniency to an FFL that has at least one willful violation but also, like Plaintiff, to its credit has greatly reduced its number of violations. The question in this case for the Court is whether Plaintiff committed at least one willful violation, not whether the Court is in favor of leniency for any willful violation(s) that did in fact occur.

[15] The Court will not speculate as to why Plaintiffs, who via this litigation demonstrate the (entirely lawful) efforts they will undertake in an attempt to keep their licenses, did not demonstrate the same kind of effort to implement straightforward measures to avoid the revocation they were warned could occur.

[16] Plaintiff cites *Armalite* for the proposition that the routine use of the phrase "at some point" by courts considering repeat violations as a theory for willfulness "indicat[es] that there is a factual continuum along which negligence, human errors, and inadvertence involving repeat violations are not alone sufficient to

As stated in its ruling denying Plaintiff's motion for a temporary restraining order, the Court is aware that Plaintiff asserts very harsh consequences absent injunctive relief. But even if true, it would be a dereliction of the Court's duty to grant a preliminary injunction where other requirements have not been met, and here Plaintiff has not met its burden in proving a likelihood of success on the merits.

The Court emphasizes that its conclusions herein, factual and otherwise, are preliminary only. That is, they are subject to potential change after the final hearing on this matter based on any intervening change in the law and evidence of record.

## CONCLUSION

For the reasons stated herein, the Motion is DENIED.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

rise to the level of recklessness, but that 'at some point' the facts could warrant an inference that the volume of errors are so significant that the licensee is simply making no effort to comply with the law[.]" (Doc. No. 40 at 5 (citing *Armalite*, 544 F.3d at 650)). While Plaintiff is largely correct, its emphasis on "volume" is misplaced. Plaintiff's argument pre-supposes that the determination of willfulness (or lack thereof) turns on the FFL's general attitude toward or scheme of compliance, as was the case in *Armalite*. But here, that determination does not turn on Plaintiff's overall attitude towards compliance. A single willful violation is sufficient to support revocation, so revocation need not depend on the pure volume of violations or a generalized plain indifference to compliance as reflected by such volume. Like in *Armalite*, here "[t]he essence of [Plaintiff's] plain indifference . . . lies in its consistent failure to ensure full and accurate completion of 4473 forms." 544 F.3d at 649-50. By failing to correct its processes repeatedly, Plaintiff "chose not to take steps to ensure future compliance" and continued to make the same violations. *Id.* at 650. "At some point, repeated negligence becomes recklessness, and that point arrived for [Plaintiff in 2022]." *Id.* To state the point one more time, in a slightly different way: by the time of the 2022 violations, Plaintiff is culpable not of an across-the-board indifference to all aspect of complying with the GCA regulations, but rather of plain indifference to the requirement to complete Forms 4473 correctly every time.